MARSH USA INC., and Marsh
& McLennan Companies,
Inc., Petitioners,

v.

Rex COOK, Respondent.

No. 09–0558.

Supreme Court of Texas.

Argued Sept. 16, 2010.

Decided Dec. 16, 2011.

Thomas L. Case, Beverly A. Whitley, John R.W. Fugitt, Bell Nunnaly & Martin LLP, Dallas, for Petitioners.

Monica Wiseman Latin, Stephanie Dooley Nelson, Jesse Keith Shumway, Carrington Coleman Sloman & Blumenthal LLP, Dallas, for Respondent.

Justice WAINWRIGHT delivered the opinion of the Court, in which Justice HECHT, Justice MEDINA, Justice JOHNSON, and Justice GUZMAN joined.

We deny Rex Cook's motion for rehearing. We withdraw our opinion of June 24, 2011 and substitute the following in its place.

In this case, we decide whether a covenant not to compete signed by a valued employee in consideration for stock options, designed to give the employee a greater stake in the company's performance, is unenforceable as a matter of law because the stock options did not give rise to an interest in restraining competition. We hold that, under the terms of the Covenants Not to Compete Act (Act), the consideration for the noncompete agreement (stock options) is reasonably related to the company's interest in protecting its goodwill, a business interest the Act recognizes as worthy of protection. The noncompete is thus not unenforceable on that basis. We reverse the court of appeals' judgment and remand to the trial court for further proceedings.

## I. BACKGROUND

Rex Cook had been employed by Marsh USA Inc. (Marsh) since 1983 and rose to become a managing director. Marsh & McLennan Companies, Inc. (MMC) is the parent company for various risk management and insurance businesses, including Marsh. On March 21, 1996, MMC granted Cook the option to purchase 500 shares of MMC common stock pursuant to its 1992 Incentive and Stock Award Plan (Plan). The Plan was developed to provide "valuable," "select" employees with the opportunity to become part owners of the company with the incentive to contribute to and benefit from the long-term growth and profitability of MMC. Under the Plan, stock option awards would vest in twenty-

five percent increments each year, becoming fully vested and exercisable after a period of four years. To exercise a stock option under the Plan's terms, employees must provide MMC with a Notice of Exercise of Option Letter, a signed Non–Solicitation Agreement (Agreement), and payment for the stock at the discounted strike price. The term of the option was ten years. Cook's option was set to expire on March 20, 2006.

In February 2005, Cook signed the Agreement and a notice form stating that he wanted to exercise the stock options to acquire 3000 shares[1] of MMC common stock at the strike price. The Agreement Cook signed provided that if he left the company within three years after exercising the options, then for a period of two years after termination Cook would not:

(a) solicit or accept business of the type offered by [MMC] during [Cook's] term of employment with [MMC], or perform or supervise the performance of any services related to such type of business, from or for (I) clients or prospects or [MMC] or its affiliates who [Cook] solicited or serviced directly ... or where [Cook] supervised, directly, indirectly, in whole or in part, the solicitation or servicing activities related to such clients or prospects; or (II) any former client of [MMC] or its affiliates who was such within two (2) years prior to [Cook's] termination of employment and who was solicited or serviced directly by [Cook] or where [Cook] supervised directly or indirectly, in whole or in part, the solicitation or servicing activities related [to] such former clients; or

(b) solicit any employee of [MMC] who reported to [Cook] directly or indirectly to terminate his employment with [MMC] for the purpose of competing with [MMC].

In addition, the Agreement provided that Cook would keep MMC's confidential information and trade secrets confidential during and after his employment with Marsh.

Less than three years after signing the Agreement and exercising the stock options, Cook resigned from Marsh and immediately began employment in Dallas with Dallas Series of Lockton Companies, LLC (Lockton), a direct competitor of MMC. Within a week after Cook's resignation, MMC sent Cook a letter including allegations that he violated the Agreement through his efforts to solicit Marsh clients and employees.

MMC filed suit against Cook and Lockton for breach of contract and breach of fiduciary duty, claiming, among other things, that Cook had solicited and accepted business from clients and prospects of Marsh who were serviced directly by Cook or where Cook supervised, directly or indirectly, the solicitation activities related to the client or potential client. Cook filed a motion for partial summary judgment on the ground that the Agreement constituted an unenforceable contract because it was not ancillary to or part of an otherwise enforceable agreement under *Light v. Centel Cellular Co. of Texas,* 883 S.W.2d 642, 647 (Tex.1994). The trial court granted Cook's motion for partial summary judgment on the breach of contract claim, concluding in the order that the Agreement was unenforceable as a matter of law. Marsh non-suited its other claims and appealed the partial summary judgment.

---

1. The increase in the number of shares subject to Cook's option is apparently due to MMC stock splits.

Relying on *Light*, the court of appeals affirmed the trial court's judgment, holding that the transfer of stock did not give rise to Marsh's interest in restraining Cook from competing. *Marsh USA Inc. v. Cook*, 287 S.W.3d 378, 382 (Tex.App.-Dallas 2009, pet. granted). Marsh appealed.

■ We granted Marsh's petition for review to address the enforceability of the covenant at issue. We review de novo issues of statutory construction and application of the law to undisputed facts in summary judgments. *McIntyre v. Ramirez*, 109 S.W.3d 741, 745 (Tex.2003); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex.2003).

## II. ENFORCEABILITY OF THE COVENANT NOT TO COMPETE

The Agreement generally prohibits Cook from soliciting or accepting business of the type offered by MMC and in which Cook was involved from clients, prospective clients, and former clients of MMC or its affiliates who were such within the two years prior to Cook's termination. It also provides that Cook may not solicit any MMC employee who reported directly or indirectly to Cook and includes a nondisclosure requirement to keep confidential MMC's trade secrets during and after his employment with Marsh.

■ Covenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and are governed by the Act. *See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681–82 (Tex.1990); *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 599–600 (Tex.App.-Amarillo 1995, no writ) (stating that non-solicitation covenants prevent the employee from soliciting customers of the employer and effectively restrict competition); *see also Guy Car-*

*penter & Co. v. Provenzale*, 334 F.3d 459, 464–65 (5th Cir.2003) (applying Texas law and stating that non-solicitation covenants restrain trade and competition and are governed by the Act); *Rimkus Consulting Grp., Inc. v. Cammarata*, 255 F.R.D. 417, 438–39 (S.D.Tex.2008) (holding that a "nonsolicitation covenant is also a restraint on trade and competition and must meet the criteria of section 15.50 of the Texas Business and Commerce Code to be enforceable" (citations omitted)). Agreements not to disclose trade secrets and confidential information are not expressly governed by the Act. *See, e.g., CRC–Evans Pipeline Int'l, Inc. v. Myers*, 927 S.W.2d 259, 265 (Tex.App.-Houston [1st Dist.] 1996, no writ); *Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 663 (Tex.App.-Dallas 1992, no writ); *see also Olander v. Compass Bank*, 172 F.Supp.2d 846, 852 (S.D.Tex. 2001). The parties concur that the Agreement in this case is governed by the Act. To the extent this Agreement extends beyond the non-disclosure of Marsh's trade secrets and confidential information, we address its enforceability under the Act.

### A. Rationale for Enforcement of Covenants Not to Compete

■ The Texas Constitution protects the freedom to contract. *See* TEX. CONST. art. I, § 16; *Fairfield Ins. Co. v. Stephens Martin Paving, LP*, 246 S.W.3d 653, 663–64 (Tex.2008); *see also In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 128–29 (Tex.2004). Entering a noncompete is a matter of consent; it is a voluntary act for both parties. However, the Legislature may impose reasonable restrictions on the freedom to contract consistent with public policy. *See Fairfield Ins. Co.*, 246 S.W.3d at 664–65. It has done so with the Texas Free Enterprise and Antitrust Act of 1983, TEX. BUS. & COM.CODE ch. 15, which includes the Act, TEX. BUS. & COM.CODE §§ 15.50–.52.

The purpose of Chapter 15 is "to maintain and promote economic competition in trade and commerce" occurring in Texas. TEX. BUS. & COM.CODE § 15.04. Unreasonable limitations on employees' abilities to change employers or solicit clients or former co-employees, *i.e.*, compete against their former employers, could hinder legitimate competition between businesses and the mobility of skilled employees. *See id.; Potomac Fire Ins. Co. v. State*, 18 S.W.2d 929, 934 (Tex.Civ.App.-Austin 1929, writ ref'd) (holding that a contract between two insurance companies to limit compensation and not hire their competitors' companies was unenforceable as it was intended to "crush and destroy competition"). On the other hand, valid noncompetes constitute reasonable restraints on commerce agreed to by the parties and may increase efficiency in industry by encouraging employers to entrust confidential information and important client relationships to key employees. *See Hill v. Mobile Auto Trim, Inc.*, 725 S.W.2d 168, 176–77 (Tex.1987) (Gonzalez, J., dissenting) (citing RESTATEMENT (SECOND) OF CONTRACTS § 188 cmt. c (1981)), *superseded by statute*, TEX. BUS. & COM.CODE § 15.50(a). Legitimate covenants not to compete also incentivize employers to develop goodwill by making them less reluctant to invest significant resources in developing goodwill that an employee could otherwise immediately take and use against them in business. *See generally* RICHARD A. POSNER, ECONOMIC ANALYSIS OF LAW § 3.1 (2d ed.1977), *cited in Hill*, 725 S.W.2d at 176 (Gonzalez, J., dissenting); *Patterson v. Crabb*, 51 S.W. 870, 871 (Tex.Civ.App.1899, writ dism'd) (recognizing under the common law the

inequity of allowing a former employee to compete against an employer by using that employer's goodwill against him when the employee had agreed not to compete with the employer). Stated differently, valid covenants not to compete ensure that the costs incurred to develop human capital are protected against competitors who, having not made such expenditures, might appropriate the employer's investment. Greg T. Lembrick, *Garden Leave: A Possible Solution to the Uncertain Enforceability of Restrictive Employment Covenants*, 102 COLUM. L.REV. 2291, 2296 (2002) (noting the employers' high cost of developing human capital, including extensive training, revelation of confidential information and exposure to key customers); *see* Harlan M. Blake, *Employee Agreements Not to Compete*, 73 HARV. L.REV. 625, 652 (1960), *cited in Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 660 (Tex.2006) (Jefferson, C.J., concurring).

The House Business and Commerce Committee echoed this purpose of the Act:

> It is generally held that these covenants, in appropriate circumstances, encourage greater investment in the development of trade secrets and goodwill employee training, providing contracting parties with a means to effectively and efficiently allocate various risks, allow the freer transfer of property interests, and in certain circumstances, provide the only effective remedy for the protection of trade secrets and good will [sic].

House Comm. on Bus. & Commerce, Bill Analysis, Tex. S.B. 946, 71st Leg., R.S. (1989).[2]

---

2. The English common law reasoned:
 Contracts for the partial restraint of trade are upheld, not because they are advantageous to the individual with whom the contract is made, and a sacrifice pro tanto of the rights of the community, but because it is for the benefit of the public at large that they should be enforced.... [T]he public derives an advantage in the ... security [a reasonable noncompete covenant] affords that the master will not withhold from the servant instruction in the secrets of his

The Legislature, presumably recognizing these interests could conflict, crafted the Act to prohibit naked restrictions on employee mobility that impede competition while allowing employers and employees to agree to reasonable restrictions on mobility that are ancillary to or part of a valid contract having a primary purpose that is unrelated to restraining competition between the parties.[3] *See* Tex. Bus. & Com. Code §§ 15.05(a), .50(a). By doing so, the Legislature facilitates its stated objective of promoting economic competition in commerce. *Id.* § 15.04.

In section 15.05(a) of the Business and Commerce Code, the Legislature included a policy limitation on the freedom between employers and employees to contract: "Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful." *Id.* Our cases recognize that such naked restraints on trade are unlawful. *See, e.g., Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 849 (Tex.2009); *Justin Belt Co. v. Yost,* 502 S.W.2d 681, 685 (Tex.1973) (citations omitted); *Weatherford Oil Tool Co. v. Campbell,* 161 Tex. 310, 340 S.W.2d 950, 952 (1960). Where the object of both parties in making such a contract "is merely to restrain competition, and enhance or maintain prices," there is no primary and lawful purpose of the relationship "to justify or excuse the restraint." *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 282–83 (6th Cir.1898), *aff'd* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899), *cited in Bus. Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 738, 108 S.Ct. 1515, 99

---

trade, and the communication of his own skill and experience, from the fear of his afterwards having a rival in the same business.

*Mallan v. May,* 11 Mees. & W. 652, 665–66 (Ex. of P. 1843). The Massachusetts Supreme Court recognized nearly two centuries ago:

[S]mall discouragements will have no injurious effect in checking in some degree a spirit of competition. An agreement with a tradesman to give him all the promisor's custom or business, upon fair terms, and not to encourage a rival tradesman to his injury, can hardly be considered as a restraint of trade. Certainly it is not such a restraint as would be injurious to the public, for in proportion as it discourages one party it encourages another.

*Palmer v. Stebbins,* 20 Mass. 188, 3 Pick. 188, 192–93 (1825). Valuing "honesty and fidelity" among businesspeople in the consideration of restrictive covenants, the Georgia Supreme Court explained that it would be a "scandal" if the law is forced to uphold a "dishonest act" as in denying enforcement of contract terms with a person "in violation of his solemn engagement." *Hood v. Legg,* 160 Ga. 620, 128 S.E. 891, 896–97 (1925) (internal quotation omitted).

3. Numerous courts espoused a similar practical common law rationale for enforcing consensual noncompetition covenants that constitute limited restraints on trade. Such reasonable restraints "afford a fair protection to the interests of the party in favour of whom it is given, and not so large as to interfere with the interests of the public." *Horner v. Graves,* 7 Bing. 735, 743 (C.P.1831); *see also United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 282–83 (6th Cir.1898), *aff'd* 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); *McClain & Co. v. Carucci,* No. 3:10–cv–00065, 2011 WL 1706810, at *4–5 (W.D.Va. May 4, 2011) (quoting *Merriman v. Cover, Drayton & Leonard,* 104 Va. 428, 51 S.E. 817, 819 (1905)); *Gafnea v. Pasquale Food Co.,* 454 So.2d 1366, 1368–69 (Ala. 1984); *Freeman v. Brown Hiller, Inc.,* 102 Ark.App. 76, 281 S.W.3d 749, 754–55 (2008); *Freudenthal v. Espey,* 45 Colo. 488, 102 P. 280, 284 (1909); *Scott v. Gen. Iron & Welding Co.,* 171 Conn. 132, 368 A.2d 111, 114 (1976); *Hood v. Legg,* 160 Ga. 620, 128 S.E. 891, 896–97 (1925); *Hursen v. Gavin,* 162 Ill. 377, 44 N.E. 735, 735 (1896); *Hammons v. Big Sandy Claims Serv., Inc.,* 567 S.W.2d 313, 315 (Ky.Ct.App.1978); *Montgomery v. Getty,* 284 S.W.2d 313, 317 (Mo.Ct.App.1955); *Eldridge v. Johnston,* 195 Or. 379, 245 P.2d 239, 250–51 (1952); *Turner v. Abbott,* 116 Tenn. 718, 94 S.W. 64, 66–69 (1906); *Kradwell v. Thiesen,* 131 Wis. 97, 111 N.W. 233, 234 (1907).

L.Ed.2d 808 (1988) (Stevens, J., dissenting); *see also Potomac Fire Ins. Co.*, 18 S.W.2d at 934. This is the basis for the requirement that the covenant be ancillary to a valid contract or transaction having a primary purpose that is unrelated to restraining competition between the parties.

The Legislature also recognized that, even though it may restrain trade to a limited degree, a valid covenant not to compete facilitates economic competition and is not a naked restraint on trade. TEX. BUS. & COM.CODE § 15.04. A noncompetition agreement is enforceable if it is reasonable in time, scope and geography and, as a threshold matter, "if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made." TEX. BUS. & COM.CODE § 15.50(a).

■ We engage in a two-step inquiry to determine this threshold requirement for enforceability under the Act. First, we determine whether there is an "otherwise enforceable agreement" between the parties, then we determine whether the covenant is "ancillary to or part of" that agreement. *Mann Frankfort*, 289 S.W.3d at 849; *Light*, 883 S.W.2d at 644.

### B. History of the Threshold Standards to Enforceability

■ At one time the common law generally prohibited all restraints on trade, *Addyston Pipe & Steel Co.*, 85 F. at 279–80,[4] and Texas jurisprudence once held covenants not to compete to be unenforceable because they were in restraint of trade and contrary to public policy. *Chenault v. Otis Eng'g Corp.*, 423 S.W.2d 377, 381–82 (Tex. Civ.App.-Corpus Christi 1967, writ ref'd n.r.e.) (citations omitted). But "people and the courts" came to recognize that "it was

in the interest of trade that certain covenants in restraint of trade should be enforced." *Addyston Pipe & Steel Co.*, 85 F. at 280; *see also Cline v. Frink Dairy Co.*, 274 U.S. 445, 461, 47 S.Ct. 681, 71 L.Ed. 1146 (1927); *Justin Belt Co.*, 502 S.W.2d at 685. And the rule became well-established in Texas that reasonable noncompete clauses in contracts pertaining to employment are not considered to be contrary to public policy as constituting an invalid restraint of trade. *DeSantis*, 793 S.W.2d at 681; *Chenault*, 423 S.W.2d at 381. Texas courts have enforced reasonable covenants not to compete dating back at least to 1899. *Patterson*, 51 S.W. at 871–72. "The courts of this State have in numerous cases enforced negative restrictive covenants not to compete when ancillary to employment involving trade or professions although such covenants may be in limited restraint of trade, provided they are reasonably limited as to duration and area." *Chenault*, 423 S.W.2d at 381–82 (citations and quotations omitted); *see also McAnally v. Person*, 57 S.W.2d 945, 949 (Tex.Civ. App.-Galveston 1933, writ ref'd); *Koenig v. Galveston Ice & Cold Storage Co.*, 18 S.W.2d 1099, 1100 (Tex.Civ.App.-Galveston 1929, no writ); Michael D. Paul & Ian C. Crawford, *Refocusing* Light: *Alex Sheshunoff Management Services, L.P. v. Johnson Moves Back to the Basics of Covenants Not to Compete*, 38 ST. MARY'S L.J. 727, 731 (2007). In 1973, we articulated for the first time the common law requirement recognized by courts of appeals in Texas and other states that a covenant not to compete must be "ancillary" to another contract, transaction or relationship. *Justin Belt Co.*, 502 S.W.2d at 683–84; *see also Potomac Fire Ins. Co.*, 18 S.W.2d at

---

4. In the thirteenth through the sixteenth centuries, the English common law generally regarded all restraints in employment contracts as departures from the principle of economic freedom and therefore void. Blake, *Employee Agreements Not to Compete*, 73 HARV. L.REV. at 631–32.

934; *Chenault,* 423 S.W.2d at 382; *Novelty Bias Binding Co. v. Shevrin,* 342 Mass. 714, 175 N.E.2d 374, 376 (1961). *See generally Bond Elec. Corp. v. Keller,* 113 N.J.Eq. 195, 166 A. 341, 342 (N.J.Ch.1933).

In the short-lived opinion of *Hill v. Mobile Auto Trim* in 1987, the Court adopted the Utah common law precept that covenants not to compete are unenforceable if they prohibit employees from obtaining jobs that share a "common calling" with their current employment. 725 S.W.2d at 172. This essentially barred noncompete agreements that protected even reasonable business interests of an employer. *See Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson,* 209 S.W.3d 644, 652–53 (Tex. 2006) (citing Sen. Research Ctr., Bill Analysis, Tex. S.B. 946, 71st Leg., R.S. (1989)).

In *DeSantis v. Wackenhut Corp.,* a covenant not to compete was held to be unreasonable and unenforceable because the employer had not shown that it needed the protection a noncompete would afford. 793 S.W.2d at 684. In that case, the interest allegedly being protected was confidential information, but the employer failed to prove that the information could create a competitive advantage and was not obtainable by persons outside of its employ. *Id.* There was no dispute in *DeSantis* that the agreement was ancillary to an otherwise valid relationship, but in defining the common law principles that govern in Texas, we stated that, for noncompete agreements to be valid and enforceable, the common law required that they be "part of and subsidiary to an otherwise valid transaction or relationship which gives rise to an interest worthy of protection." *Id.* at

682 (citing RESTATEMENT (SECOND) OF CONTRACTS § 187 cmt. b (1981)).

While *DeSantis* was pending before this Court, the Legislature passed the Act, adding to Chapter 15, Monopolies, Trusts and Conspiracies in Restraint of Trade, of the Texas Business and Commerce Code. *Id.* at 684 (citing Act of May 23, 1989, 71st Leg., R. S., ch. 1193, § 1, 1989 Tex. Gen. Laws 4852). Section 15.50(a) of the new Act provided:

> Notwithstanding section 15.05 of this code, and subject to any applicable provision of Subsection (b), a covenant not to compete is enforceable if it is ancillary to or part of an otherwise enforceable agreement at the time the agreement is made to the extent that it contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.

TEX. BUS. & COM.CODE § 15.50(a). The Act was intended to reverse the Court's apparent antipathy to covenants not to compete and specifically to remove the obstacle to their use presented by the narrow "common calling" test instituted by *Hill,* and to "restore over 30 years of common law developed by Texas Courts and remove an impairment to economic development in the state." *Sheshunoff,* 209 S.W.3d at 653 (quoting House Research Org., Bill Analysis, Tex. S.B. 946, 71st Leg., R.S. (1989)). Quite simply, "[t]he purpose of the act was to return Texas' law generally to the common law as it existed prior to *Hill v. Mobile Auto Trim.*" *Peat Marwick Main & Co. v. Haass,* 818 S.W.2d 381, 388 (Tex. 1991) (citation omitted).[5] Under the com-

---

5. In addition to legislatively overruling *Hill's* "common calling" requirement, the Act also made explicit that a court could reform covenants that contained unreasonable restrictions on time, geographical area, or scope of

activity or restrictions that were greater than necessary to make them reasonable and no greater than necessary, and could provide money damages for a violation occurring after reformation. *Peat Marwick Main & Co. v.*

mon law prior to *Hill,* the "rule [was] well established in Texas that non-competition clauses in contracts pertaining to employment [were] not normally considered to be contrary to public policy as constituting an invalid restraint of trade." *Chenault,* 423 S.W.2d at 381.

■■ In the two-step threshold inquiry to determine if a covenant not to compete is enforceable under the Act, we determine whether there is an "otherwise enforceable agreement" between the parties, and, if so, we determine whether the covenant is "ancillary to or part of" that agreement. *Mann Frankfort,* 289 S.W.3d at 849 (quoting *Light,* 883 S.W.2d at 644). The "otherwise enforceable agreement" requirement is satisfied when the covenant is "part of an agreement that contained mutual non-illusory promises." *Sheshunoff,* 209 S.W.3d at 648–49 (quoting *Light,* 883 S.W.2d at 646); *see also DeSantis,* 793 S.W.2d at 681 (noting that "the agreement not to compete must be ancillary to an otherwise valid transaction or relationship," including purchase and sale of a business and employment relationships (citations omitted)). No one contests that an "otherwise enforceable agreement" exists in this case—Cook entered into an agreement that he would not solicit Marsh's clients, recruit Marsh's employees, or disclose confidential information in exchange for the stock option price. There is offer, acceptance, and consideration for the mutual promises, and the nondisclosure agreement is an "otherwise" enforceable agreement. *See Sheshunoff,* 209 S.W.3d at 648; *see also Mann Frankfort,* 289 S.W.3d at 850 (noting that an implied promise may support an "otherwise enforceable agreement"). The question in this case is whether Cook's covenants are "ancillary to

or part of" the otherwise enforceable agreement.

In *Light v. Centel Cellular Co. of Texas,* we first considered a two-pronged approach to determine whether the covenant is "ancillary to or part of" the otherwise enforceable agreement, requiring that:

> (1) the consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing; and (2) the covenant must be designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement.

883 S.W.2d at 647. Today we address the first prong of *Light*'s explication of the "ancillary to or part of" requirement, *i.e.,* whether the Act requires that consideration for covenants not to compete must "give rise" to the employer's interest in restraining the employee from competing. *Id.*

### C. The "Give Rise" Requirement

■ It is important to note that the Act itself does not include a "give rise" requirement, nor does it define "ancillary." In Texas, the common law "give rise" requirement was first stated in *DeSantis* in 1987. 793 S.W.2d at 682. We held that the common law prior to the enactment of the Act required that noncompete agreements be "part of and subsidiary to an *otherwise valid transaction or relationship* which gives rise to an *interest worthy of protection.*" *Id.* (citing RESTATEMENT (SECOND) OF CONTRACTS § 187 cmt. b (1981)) (emphasis added). *Light* diverged from the common law definition of "give rise" as articulated in *DeSantis. See id.* Rather than requiring that the otherwise enforceable agreement give rise to "an interest

---

*Haass,* 818 S.W.2d 381, 388 (Tex.1991); TEX. BUS. & COM.CODE § 15.51(c); *see also Light v. Centel Cellular Co. of Tex.,* 883 S.W.2d 642,

644 (Tex.1994) (citing TEX. BUS. & COM.CODE § 15.52) (stating that the Act supplanted prior common law).

worthy of protection," *Light* imposed a stricter requirement: that the consideration give rise to "the employer's *interest in restraining the employee from competing.*" *Light,* 883 S.W.2d at 647 (emphasis added). *Light*'s "give rise" condition on the enforceability of noncompetes was more restrictive than the common law rule the Legislature intended to resurrect. Although we have recognized on multiple occasions that goodwill, along with trade secrets and other confidential or proprietary information, is a protectable business interest, *Light*'s "give rise" language narrowed the interests the Act would protect, excluding much of goodwill as a protectable business interest. *See id.; DeSantis,* 793 S.W.2d at 682; *see also Sheshunoff,* 209 S.W.3d at 649; *Olander,* 172 F.Supp.2d at 855 & n. 12 (noting that *Light* recognized covenants to protect confidential information as otherwise enforceable agreements but suggesting that the stock options at issue could give rise to protection of goodwill); *cf. McAnelly v. Brady Med. Clinic, P.A.,* No. 03–04–00095–CV, 2004 WL 2556634, at *2–3 (Tex. App.-Austin Nov. 12, 2004, no pet.) (stating that noncompetes are "disfavored contract[s]" and holding that the sale of a medical practice was merely a sale of medical supplies and thus not an interest worthy of protecting through a covenant not to compete). Commentators noticed that in Texas caselaw, "[o]ther than a promise not to disclose trade secrets and confidential information, little else seems to satisfy this prong of the statute." Paul & Crawford, *Refocusing* Light, 38 St. Mary's L.J. at 752.[6] This, despite the apparent objective of the Legislature in overruling *Hill* to "restore over 30 years of common law developed by Texas Courts and remove an impairment to economic development in the state." *Sheshunoff,* 209 S.W.3d at 653 (quoting House Research Org., Bill Analysis, Tex. S.B. 946, 71st Leg., R.S. (1989)); *see also Peat Marwick,* 818 S.W.2d at 388.

In the two instances after *Light* in which this Court interpreted the Act, *Light*'s "give rise" standard was not at issue. However, we retreated from some of *Light*'s other precepts. Under *Light,* a unilateral contract (formed when one of the promises was illusory) could not support a covenant not to compete because it was not " 'an otherwise enforceable agreement at the time the agreement [was] made.' " *Light,* 883 S.W.2d at 645 n. 6 (quoting Tex. Bus. & Com.Code § 15.50). In *Alex Sheshunoff Management Services, L.P. v. Johnson,* we revisited the meaning of the phrase "at the time the agreement is made," and determined that *Light* was overly restrictive. 209 S.W.3d at 651. We held that "at the time the agreement is made" modified "ancillary to or part of" rather than the "otherwise enforceable agreement," and thus a unilateral contract that was unenforceable when made could support a covenant not to compete as long as the covenant was "ancillary to or part of" the agreement at the time the agreement was made. *Id.; see also Vanegas v. Am. Energy Servs.,* 302 S.W.3d 299, 302–03 (Tex.2009) (applying *Sheshunoff*'s unilateral contract rationale). The covenant not to compete in *Sheshunoff* was enforceable despite being supported by an executory unilateral contract. *Sheshunoff,* 209 S.W.3d at 651. In addition, we re-emphasized that the focus in applying section 15.50 should be on the reasonableness of the covenant. *Id.* at 655–56.

In *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* we took another step

---

**6.** The covenant also had to be designed to enforce a return promise of the covenantee, which further narrowed beyond the common law precepts the applicability of covenants not to compete. *See* Paul & Crawford, *Refocusing* Light, 38 St. Mary's L.J. at 752.

away from *Light*'s restrictiveness and toward greater enforceability of noncompete agreements. 289 S.W.3d 844 (Tex.2009). The employer did not expressly promise to provide the employee with confidential information, but the employee's position mandated such information be provided. *Id.* at 850. The employee promised not to disclose confidential information obtained. *Id.* We held that "[w]hen the nature of the work the employee is hired to perform requires confidential information to be provided ... the employer impliedly promises confidential information will be provided." *Id.*

Turning to the "give rise" question, the Legislature did not include a requirement in the Act that the *consideration* for the noncompete must give rise to the interest *in restraining competition with the employer.* Instead, the Legislature required a nexus—that the noncompete be "ancillary to" or "part of" the otherwise enforceable agreement between the parties. Tex. Bus. & Com.Code § 15.50(a). There is nothing in the statute indicating that "ancillary" or "part" should mean anything other than their common definitions. "[A]ncillary means 'supplementary' and part means 'one of several ... units of which something is composed.' " *Sheshunoff,* 209 S.W.3d at 651, 665 (Wainwright, J., concurring) (quoting Webster's Ninth New Collegiate Dictionary 84, 857 (9th ed.1990)).

■ In this case, the trial court and court of appeals held that the covenant not to compete was not ancillary to an otherwise enforceable agreement under the *Light* test. 287 S.W.3d at 381–82. The court of appeals concluded that "the fact that a company's business goodwill benefits when an employee accepts the offered incentive and continues his employment does not mean that the incentive gives rise to an employer's interest in restraining the employee from competing." *Id.* Under section 15.50 and the Texas common law, it does not have to. The statute requires that a covenant not to compete be ancillary to an otherwise enforceable agreement. Tex. Bus. & Com.Code § 15.50(a). The common meaning of those words control; the covenant not to compete must be ancillary to (supplementary) or part of (one of several units of which something is composed) an otherwise enforceable agreement. *See Sheshunoff,* 209 S.W.3d at 664–65 (Wainwright, J., concurring). This interpretation is confirmed by the pre-existing common law requirement that the otherwise enforceable agreement must be "part of and subsidiary to" the employment relationship giving rise to the interest worthy of protection. *DeSantis,* 793 S.W.2d at 682. Furthermore, there is no compelling logic in *Light*'s conclusion that consideration for the otherwise enforceable agreement gives rise to the interest in restraining the employee from competing. *See Sheshunoff,* 209 S.W.3d at 664–65 (Wainwright, J., concurring). Consideration for a noncompete that is reasonably related to an interest worthy of protection, such as trade secrets, confidential information or goodwill, satisfies the statutory nexus; and there is no textual basis for excluding the protection of much of goodwill from the business interests that a noncompete may protect. *Light*'s requirement is contrary to the language of the Act; thwarts the purpose of the Act, which was to expand rather than restrict the enforceability of such covenants; and contradicts the Act's intent to return Texas law on the enforceability of noncompete agreements to the common law prior to *Hill. See Sheshunoff,* 209 S.W.3d at 652–63.

Requiring that a covenant not to compete be ancillary to an otherwise enforceable agreement or relationship ensures that noncompete agreements that are

naked restraints of trade will not be enforceable under the Act. *See* RESTATEMENT (SECOND) OF CONTRACTS § 187 cmt. b (1981). The common law requirement that there be a nexus between the otherwise valid transaction and the interest worthy of protection bolsters the ancillary requirement. *DeSantis,* 793 S.W.2d at 681–82. The stated purpose of the Act is to "maintain and promote economic competition in trade and commerce," and it countenances the enforcement of reasonable covenants not to compete. TEX. BUS. & COM.CODE §§ 15.04, .50(a). Robust competition and reasonable covenants not to compete can co-exist. Adding more stringent requirements on top of those in the Act is unnecessary to prevent naked restraints on trade and would thwart the Legislature's attempt to enforce reasonable covenants under the Act. *See Mann Frankfort,* 289 S.W.3d at 858–59 (Hecht, J., concurring).

### D. MMC's Covenant Not to Compete

"A person's right to use his own labor in any lawful employment is ... one of the first and highest of civil rights." *Int'l Printing Pressmen & Assistants' Union of N. Am. v. Smith,* 145 Tex. 399, 198 S.W.2d 729, 740 (1947) (citing 2 COOLEY'S LAW OF TORTS 584, 587 (3d ed.1906)). This value is protected by sections 15.05 and 15.50(a) of the Texas Free Enterprise and Antritrust Act of 1983 and is not offended by enforcing covenants not to compete that comply with section 15.50(a). *See* TEX. BUS. & COM.CODE §§ 15.05, .50(a); Michael Newman & Shane Crase, *The Rule of Reason in Drafting Noncompete Agreements,* FED. LAW., Mar.-Apr.2007, at 21 (discussing how noncompete agreements can benefit both the employer and employee); *see generally* B. Prater Monning, III, Note, *Employee Covenants Not to Compete: The Justin Bootstrap Doctrine,* 28 Sw. L.J. 608, 613 (1974).

In this instance, Cook exercised the stock options and became an owner. Sally Dillenback, the head of Marsh's Dallas office, explained in her uncontested affidavit:

The purpose of the Incentive Plan was to advance the interests of MMC and its stockholders by providing a means to attract, retain, and motivate employees of MMC and its affiliates, including Marsh, and to strengthen the mutuality of interest between employees and MMC's stockholders. The Incentive Plan was designed so that a valuable employee could ultimately benefit from an increase in the value of the business and profits, whereas, as an employee without stock options, Cook was limited to only those benefits provided to any employee of the firm. The Incentive Plan provides select employees with an incentive to stay with Marsh long-term; namely, an ownership interest in the company. This, in turn, gives employees an interest in ensuring that the company performs well and that its stock rises (thereby increasing the value of their options). The Incentive Plan also serves to enhance the relationships between Marsh and its customers by helping the company retain highly-motivated employees with an interest in the long-term success of the company, which, in turn enhances the goodwill of Marsh. The covenant not to compete provision of the Non–Solicitation Agreement prevents employees from using that goodwill, *i.e.,* the relationship between Marsh, the employee, and the customer, to attract the customer to a competitor.

Cook was a managing director of Marsh, and as affirmed by Dillenback, he was a "valuable employee who had successfully performed at his position at Marsh ... and had been successful with attracting and retaining business for Marsh." She further explained that in the insurance brokerage industry, "long-term, personal

contact between the employee and customer is especially important due to similarity in the product offered by competitors. The advantage acquired through the employee's long-term relationship and contact with customers is part of MMC's goodwill." For those reasons, he was awarded the stock options. Awarding to Cook stock options to purchase MMC stock at a discounted price provided the required statutory nexus between the noncompete and the company's interest in protecting its goodwill. Exercising the stock options to purchase MMC stock triggered the restraints in the noncompete.

By awarding Cook stock options, Marsh linked the interests of a key employee with the company's long-term business interests. Stockholders are "owners" who, beyond employees, benefit from the growth and development of the company. Owners' interests are furthered by fostering the goodwill between the employer and its clients. The stock options are reasonably related to the protection of this business goodwill. Thus, this covenant not to compete is ancillary to an otherwise enforceable agreement.[7] And, in the Legislature's apparent judgment, reasonable noncompetes encourage greater investment in the development of goodwill and employee training. The dissent concedes that exercising stock options to become an owner "could motivate an employee to create goodwill, thus increasing the value of the interest worthy of protection." 354 S.W.3d 764 n. 9 (Green, J., dissenting).

■■■ The hallmark of enforcement is whether or not the covenant is reasonable. *See Sheshunoff,* 209 S.W.3d at 655 (citing TEX. BUS. & COM.CODE § 15.50(a)).

The enforceability of the covenant should not be decided on "overly technical disputes" of defining whether the covenant is ancillary to an agreement. *Sheshunoff,* 209 S.W.3d at 655. "Rather, the statute's core inquiry is whether the covenant 'contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee.'" *Id.* (quoting TEX. BUS. & COM.CODE § 15.50(a)).

■■■ Marsh sought an agreement not to compete from Cook to protect the company's goodwill—namely, the relationships the company has developed with its customers and employees and their identities, due in part to Cook's performance as a valued employee. The Act provides that "goodwill" is a protectable interest. TEX. BUS. & COM.CODE § 15.50(a); *see also Mann Frankfort,* 289 S.W.3d at 848 (quoting TEX. BUS. & COM.CODE § 15.50(a)); *Sheshunoff,* 209 S.W.3d at 648 (same); *Peat Marwick,* 818 S.W.2d at 386. Texas law has long recognized that goodwill, although intangible, is property and is an integral part of the business just as its physical assets are. *Alamo Lumber Co. v. Fahrenthold,* 58 S.W.2d 1085, 1088 (Tex.Civ.App.-Beaumont 1933, writ ref'd); *Taormina v. Culicchia,* 355 S.W.2d 569, 573 (Tex.Civ.App.-El Paso 1962, writ ref'd n.r.e.). Goodwill is defined as:

the advantage or benefits which is acquired by an establishment beyond the mere value of the capital stock, funds or property employed therein, in consequence of the general public patronage and encouragement which it receives

---

7. The second prong of the *Light* test to determine if a covenant not to compete is ancillary to an otherwise enforceable agreement, which requires that the covenant be designed to enforce the employee's promise, is not at issue in this case. *Light,* 883 S.W.2d at 647. However, we re-emphasize that the Act provides for the enforcement of *reasonable* covenants not to compete. TEX. BUS. & COM.CODE § 15.50(a).

from constant and habitual customers on account of its local position, or common celebrity, or reputation for skill, or influence, or punctuality, or from other accidental circumstances or necessities, or even from ancient partialities or prejudices.

*Taormina*, 355 S.W.2d at 573; *see also* BLACK'S LAW DICTIONARY 703 (7th ed.1999) (defining "goodwill" as "[a] business's reputation, patronage, and other intangible assets that are considered when appraising the business ..."). The Act recognizes Marsh's goodwill as an interest worthy of protection.

We do not decide whether the Agreement is reasonable as to time, scope of activity, and geographical area. If the trial court determines that any particular provision is unreasonable or overbroad, the trial court has the authority to reform the Agreement and enforce it by injunction with reasonable limitations. TEX. BUS. & COM.CODE § 15.51(c); *Campbell,* 340 S.W.2d at 952. We hold that if the relationship between the otherwise enforceable agreement and the legitimate interest being protected is reasonable, the covenant is not void on that ground.

### III. TIMING REQUIREMENT

■ Marsh also contends that the court of appeals imposed a new timing requirement, where the employer's interest in restraining the employee cannot exist before the employer's consideration is given. 287 S.W.3d at 382. Such a requirement is inconsistent with our ruling in *Sheshunoff.* In *Sheshunoff,* the employer agreed to provide confidential information in exchange for the employee's agreement to keep the information confidential and covenant not to compete, however the employee had already received confidential information from the employer. 209 S.W.3d at 647. We concluded that the

agreement was reasonable and enforceable despite the passage of confidential information from employer to employee prior to the agreement. *Id.* at 647, 657. We did note that the parties disputed whether the nature of the confidential information received prior to the agreement differed from the confidential information received after the agreement, but focused on the fact that confidential information was provided after the agreement, fulfilling the employer's promise. *Id.* at 647. There is no requirement under Texas law that the employee receive consideration for the noncompete agreement prior to the time the employer's interest in protecting its goodwill arises.

### IV. RESPONSE TO DISSENT

■ The dissent argues that our opinion thwarts the legislative intent. 354 S.W.3d 764 (Green, J., dissenting). Legislative intent is discerned from the words used. As determined from the language of the statute, our opinion requires that the covenant not to compete be ancillary to or part of an otherwise enforceable agreement. The former judicial requirement that the "consideration given by the employer in the otherwise enforceable agreement must give rise to the employer's interest in restraining the employee from competing" is not anchored in the text of the Act. *See Light,* 883 S.W.2d at 647. We attempt to construe the Legislature's words. *See* Eric Behrens, *A Trend Toward Enforceability: Covenants Not to Compete in At–Will Employment Relationships Following* Sheshunoff *and* Mann Franfort, 73 TEX. B.J. 732, 738 (Oct.2010) (stating that the Court's interpretations of section 15.50(a) "show a trend toward enforceability of non-compete clauses that is true to the legislative intent behind the Covenants Not to Compete Act and the 1993 amendments").

The Legislature passed the Act to overturn this Court's opinion *Hill v. Mobile Trim.* Reinforcing this point, the House Research Organization indicated that the purpose was to reverse the Court's antipathy toward such covenants. House Research Org., Bill Analysis, Tex. S.B. 946, 71st Leg., R.S. (1989). We are somewhat befuddled by the continued antipathy to reliance on consensual and reasonable noncompetes as one means "to encourage greater investment in the development" of business goodwill. *Id.* The dissent frowns on noncompetes reasonably related to goodwill that are not tied specifically to trade secrets, confidential information or special training. 354 S.W.3d 764 (Green, J., dissenting) (stating that "[t]rade secrets, confidential information, and special training" may support a covenant not to compete but failing to include goodwill). The comparison is presumably to trade secrets and confidential information, which, the dissent's logic suggests, are well-defined and easily proved or disproved, a position with a number of detractors. *See In re Bass,* 113 S.W.3d 735, 740 (Tex.2003) (recognizing that the six factor test for trade secrets in the Restatement (Third) of Unfair Competition is "relevant but not dispositive," and that it is appropriate to weigh trade secret factors in the context of surrounding circumstances); RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 39 cmt. d (1995) ("It is not possible to state precise criteria for determining the existence of a trade secret."). There are close calls in disputes over trade secrets, confidential information, and goodwill. Irrespective of differing views of the importance of business goodwill, the issue has been resolved. The Act expressly provides that goodwill is an interest worthy of protection, and the common law before that agreed. TEX. BUS. & COM.CODE § 15.50(a); *Mann Frankfort,* 289 S.W.3d at 858; *Sheshunoff,* 209 S.W.3d at 649

(citations omitted); *DeSantis,* 793 S.W.2d at 682.

 Further, *stare decisis* does not compel perpetuating an interpretation of section 15.50 that the entire Court agrees cannot be discerned from the text of the statute. *See* 354 S.W.3d 764 (Green, J., dissenting). Construing statutes as written is necessary to predictability in statutory interpretation and to validating the public's trust in and reliance on the words it reads in the statute books. Certainly, the doctrine of *stare decisis* is essential to the stability of the law, which is the reason departures from it are rare. Here, the doctrine has little force as we have questioned *Light* each time we have discussed it and have never affirmed *Light* 's "give rise" requirement. We explained in *Southwestern Bell Telephone Co. v. Mitchell:*

> Generally, the doctrine of stare decisis dictates that once the Supreme Court announces a proposition of law, the decision is considered binding precedent, but we have long recognized that the doctrine is not absolute. [W]e adhere to our precedents for reasons of efficiency, fairness, and legitimacy, and when adherence to a judicially-created rule of law no longer furthers these interests, and the general interest will suffer less by such departure, than from a strict adherence, we should not hesitate to depart from a prior holding. [U]pon no sound principle do we feel at liberty to perpetuate an error, into which either our predecessors or ourselves may have unadvisedly fallen, merely upon the ground of such erroneous decision having been previously rendered.

276 S.W.3d 443, 447 (Tex.2008) (internal quotation marks omitted, alterations in original). Our brethren have reasoned that *stare decisis* does not compel them to follow a past decision when its rationale

does not withstand "careful analysis." *Arizona v. Gant,* 556 U.S. 332, 129 S.Ct. 1710, 1722, 173 L.Ed.2d 485 (2009) (citation omitted). The Court agreed twice before that careful analysis compels a modification of our construction of section 15.50, and it is appropriate to modify *Light* here as well.

## V. CONCLUSION

In this case, the covenant not to compete is "ancillary to or part of" an otherwise enforceable agreement because the business interest being protected (goodwill) is reasonably related to the consideration given (stock options). Section 15.50 requires that there be a nexus between the covenant not to compete and the interest being protected. Tex. Bus. & Com.Code § 15.50(a). This requirement is satisfied by the relationship that exists here. We reverse the judgment of the court of appeals and remand to the trial court for further proceedings consistent with this opinion.

Justice WILLETT delivered an opinion concurring in the judgment.

Justice GREEN delivered a dissenting opinion, in which Chief Justice JEFFERSON and Justice LEHRMANN joined.

1. Tex. Bus. & Com.Code § 15.50(a).

2. Though styled a "Non–Solicitation Agreement," the agreement also operates as a kitchen-sink noncompetition agreement. Besides stating Cook may not "solicit" business from Marsh's clients or prospects, it also says Cook may not "accept," "perform," or "supervise" business involving them.

3. The efficacy of restrictions on employee mobility is a matter of spirited debate among economists, lawyers, and legal scholars. A growing body of nascent scholarship contends that overbroad noncompete agreements actu-

Justice WILLETT, concurring in the judgment only.

I agree the trial court should take first crack at assessing whether today's non-competition covenant "contains limitations as to time, geographical area, and scope of activity . . . that are reasonable and do not impose a greater restraint than is necessary." [1] That inquiry—essentially, "Are the restrictions *too* restrictive?"—received scant attention below, rendering the record before us underdeveloped. The affidavit submitted by Marsh USA (Marsh) asserts that the stock-incentive plan aimed to boost goodwill by giving Cook a stake in Marsh's long-term success. [2] Growing goodwill is all well and good, but the affidavit then says this: The noncompete "prevents employees from using that goodwill . . . to attract the customer to a competitor." On the surface, this seems just another way of saying the noncompete's purpose is to stifle competition, but perhaps a fuller record on remand will paint a less protectionist picture.

So I agree to remand, but I write separately to underscore this admittedly obvious point: Restrictions on employee mobility that exist only to squelch competition are per se illegal in Texas, and for good reason. Economic dynamism in the 21st century requires speed, knowledge, and innovation—imperatives that must inform judicial review of efforts to sideline skilled talent. [3] Courts must critically examine

ally harm innovation rather than foster it when they irrationally impede job-hopping. *See, e.g.,* Norman D. Bishara, *Covenants Not to Compete in a Knowledge Economy: Balancing Innovation From Employee Mobility Against Legal Protection for Human Capital Investment,* 27 Berkeley J. Emp. & Lab. L. 287, 306–07 (2006) [hereinafter "Bishara, *Covenants Not to Compete in a Knowledge Economy* "]; Ronald J. Gilson, *The Legal Infrastructure of High Technology Industrial Districts: Silicon Valley, Route 128, and Covenants Not to Compete,* 74 N.Y.U. L.Rev. 575, 594–619 (1999); Charles Tait Graves and James A.

noncompetes in light of our contemporary, knowledge-based economy that prizes ingenuity and intellectual talent. This much is clear: Courts cannot countenance covenants too contemptuous of competition.

\* \* \*

Amid increasing labor fluidity, there is no shortage of debate surrounding the propriety of enforcing restrictive covenants that tie up skills, knowledge, ideas, and expertise. The fault line runs between first principles—freedom of contract versus freedom of competition—and judicial treatment of noncompetes has been, well, eclectic.[4] Some jurisdictions favor freedom of contract (enforcing a noncompete because the employee signed it) and fret little about whether the company's interest is legitimate;[5] other jurisdictions (most

notably, California) champion freedom of competition and void virtually all noncompetes;[6] Texas courts, like most, enforce "reasonable" ones necessary to protect legitimate interests.[7] This multiplicity of standards across states—dubbed "fifty ways to leave your employer"[8]—makes for an unsteady legal landscape, particularly for far-flung employers that operate throughout the country.

Today's case, like many before it, involves a familiar tension between company and employee, both intent on self-protection. The interest Marsh aims to protect, though, is less familiar. Marsh does not argue that the noncompete was needed here to protect costly investments in specialized training or to ensure its trade secrets or other confidential information[9]

DiBoise, *Do Strict Trade Secret and Non–Competition Laws Obstruct Innovation?*, 1 ENTREPRENEURIAL BUS. L.J. 323, 323 (2006) [hereinafter "Graves and DiBoise, *Strict Trade Secret and Non–Competition Laws*"]; Alan Hyde, *Should Noncompetes Be Enforced?*, REGULATION (Cato Inst.), Winter 2010–11, at 6; Alan Hyde, *The Wealth of Shared Information: Silicon Valley's High–Velocity Labor Market, Endogenous Economic Growth, and the Law of Trade Secrets* (Sept.1998), http://andromeda.rutgers.edu/~hyde/WEALTH.htm.

4. As noted in 1960—and this persists a half-century later—court precedent "has reflected the evolution of industrial technology and business methods, as well as the ebb and flow of such social values as freedom of contract, personal economic freedom, and business ethics. But the fundamental interests which come into conflict have not basically changed." Harlan M. Blake, *Employee Agreements Not To Compete*, 73 HARV. L.REV. 625, 626–27 (1960) [hereinafter "Blake, *Employee Agreements*"].

5. *See* Brandon S. Long, *Protecting Employer Investment in Training: Noncompetes vs. Repayment Agreements*, 54 DUKE L.J. 1295, 1302–03 (2005) ("For instance, some courts have found that freedom of contract principles support enforcing all contracts made between competent parties, so long as those contracts

are neither illegal nor unconscionable.") (footnote omitted).

6. CAL. BUS. & PROF.CODE § 16600; Viva R. Moffat, *The Wrong Tool for the Job: The IP Problem With Noncompetition Agreements*, 52 WM. & MARY L.REV. 873, 877 n. 5 (2010) [hereinafter "Moffat, *The Wrong Tool*"].

7. Moffat, *The Wrong Tool*, at 880.

8. Bishara, *Covenants Not to Compete in a Knowledge Economy*, at 317.

9. The mere fact that the noncompete prohibited Cook from disclosing trade secrets or confidential or proprietary information is immaterial given the absence of anything in the record showing that Cook ever received such information. *See* Plaintiffs' Resp. to Defendant's Mot. Summ. J. at 18 ("Cook's reliance on *Sheshunoff* is particularly misplaced. *Sheshunoff* involved confidential information, not stock.") (citation omitted); Pet. Br. at 11 n. 10 ("[C]onfidential information was not at issue."); Transcript of Oral Argument at 2, *Marsh USA Inc. v. Cook*, 354 S.W.3d 764 (2011) (No. 09–0558) ("This is a not a confidential information case...."). As we explained in *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, the employer must at some point provide consideration for the agreement, such

do not wind up on WikiLeaks.[10] Marsh speaks of safeguarding its goodwill, and that is a protectable interest. But uttering the word goodwill is not enough; magic words do not boast auto-enforceability. Marsh must demonstrate that it is not invoking goodwill to camouflage a less noble interest: escaping future competition from Cook.[11]

As the trial court begins its examination, I add these two points:

*First,* while goodwill is a protectable interest, protectionism—going *too far* to protect what may be protectable—is verboten. Texas courts must probe noncompete covenants in that pro-free-market spirit. The Free Enterprise and Antitrust Act declares the public policy of Texas: "Every contract, combination, or conspiracy in restraint of trade or commerce is unlawful."[12] The Act's paramount purpose "is to maintain and promote economic competition in trade and commerce ... and to provide the benefits of that competition to consumers in the state."[13]

One obvious exception is the Covenants Not to Compete Act,[14] which permits a noncompete clause, but only "to the extent it contains limitations as to time, geographical area, and scope of activity to be restrained that are *reasonable* and do not impose a greater restraint than is *necessary* to protect the goodwill or other business interest of the promisee."[15] This exception is just that—an exception—with the rule favoring robust competition.

As for who decides whether limitations (1) are reasonable, (2) are more severe than necessary, and (3) relate to a legitimate business interest, the Covenants Not to Compete Act expressly vests that duty with courts.[16] Judges must divine when competition becomes *unfair* competition and when a restraint becomes an *unreasonable* or *unnecessarily restrictive* restraint. To be sure, the standard has a certain eye-of-the-beholder flavor—a vagueness that inexorably produces the case-by-case unpredictability that haunts this area of employment law.[17]

---

as confidential information, in order for the agreement to be enforceable. 209 S.W.3d 644, 650–51 (Tex.2006).

**10.** As *Light v. Centel Cellular Co. of Tex.* demonstrates, however, even these alleged interests would not automatically render the covenant valid. *See* 883 S.W.2d 642, 646–48 (Tex. 1994) (holding invalid a covenant not to compete *that* pertained *to* specialized training, even though confidential or proprietary information was involved).

**11.** There is no significance to the fact that Cook was paid in stock options for the covenant not to compete. Where the goal is restricting competition, the manner of payment is irrelevant. If stock options permit such a covenant because, as the affidavit states, they align the interests of the employee with "the long-term success of the company, which, in turn enhances the goodwill of" the employer, then *any* reward for a job well done—a raise, promotion, bonus, or pension—could justify a noncompete on grounds it aligns employer/employee interests and thus bolsters "good-

will." At bottom, none of these rewards, like "merely promising to pay a sum of money to the employee," can be used to purchase a noncompete whose only purpose is to eliminate competition. *Sheshunoff,* 209 S.W.3d at 650. Absent some other legitimate reason, such a restraint on trade is unenforceable.

**12.** Tex. Bus. & Com.Code § 15.05(a).

**13.** *Id.* § 15.04.

**14.** *See id.* § 15.50(a) ("Notwithstanding Section 15.05 of this code ... a covenant not to compete is enforceable....").

**15.** *Id.* (emphasis added).

**16.** *Id.* §§ 15.50–.51.

**17.** In a sense, the "reasonableness" inquiry resembles the oversight long exercised by courts when applying the rule of reason under antitrust laws. While "reasonableness" analysis in *noncompete* cases and "rule of rea-

Alongside "reasonableness," the statute also requires that the agreement "not impose a greater restraint than is necessary."[18] We have never squarely addressed whether the Act envisions two separate inquiries: (1) that the time/geography/scope limitations be "reasonable," and also (2) that the restraint not reach beyond that which is "necessary" to protect the company's protectable interests. The latter suggests more exacting scrutiny than mere "reasonableness." The Act separates the latter from the former with the conjunction "and," suggesting separateness, while the pre–1993 version of the Act fused the two explicitly.[19] None of our cases declare whether "reasonable" and "necessary" are two separate inquiries or whether the latter is simply blended into the former. Many courts implicitly subsume everything under an overarching banner of reasonableness,[20] while others treat them as separate prongs.[21] Either way, it is not an issue we reach today.

So while Texas law allows limited noncompetes, it does not allow protectionism to trump individual or societal interests in a dynamic marketplace. And even assuming a company is trying to guard a bona fide business interest, Texas courts must strike down restrictions that are unreasonable or more severe than necessary.

The underpinnings of this principle long predate Texas (or America) and draw from the recognition that bustling markets best spur and reward ingenuity.[22] The Lone

---

son" analysis in antitrust cases are not identical, both inquiries envision a front-and-center judicial role in scrutinizing agreements that curb competition.

> Rule of reason analysis under antitrust laws must not be confused with reasonableness analysis under the common law. Rule of reason analysis tests the effect of a restraint of trade on *competition*. By contrast, whether a noncompetition agreement is reasonable depends upon its effect on the parties, the *competitors*, as it were. The two standards are not directly related.

*DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex.1990). While this portion of our analysis draws upon the instant contract's effect on competition, that analysis stems from an initial consideration of the contract's effect on the parties, who are—at bottom— actors in a broader competitive scheme. This slight distinction demonstrates that while the two standards may not be directly related, in practice they are indirectly related.

**18.** Tex. Bus. & Com.Code § 15.05(a).

**19.** Under the pre–1993 version, a noncompete was enforceable to the extent it "contains reasonable limitations as to time, geographical area, and scope of activity to be restrained *that* do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Act of May 23, 1989, 71st Leg., R.S., ch. 1193, § 1, 1989 Tex. Gen. Laws 4852 (amended 1993) (current version at Tex Bus. & Com.Code § 15.50(a)) (emphasis added). The current version reads, "contains limitations as to time, geographical area, and scope of activity to be restrained that are reasonable *and* do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." Tex Bus. & Com. Code § 15.50(a); Act of May 29, 1993, 73d Leg., ch. 965, § 1, 1993 Tex. Gen. Laws 4201 (emphasis added).

**20.** *See, e.g., Zep Mfg. Co. v. Harthcock*, 824 S.W.2d 654, 660 (Tex.App.-Dallas 1992, no writ).

**21.** *See, e.g., Am. Express Fin. Advisors, Inc. v. Scott*, 955 F.Supp. 688, 691 (N.D.Tex.1996).

**22.** Adam's Smith ode to laissez-faire economics, *The Wealth of Nations*, remains worthy of study today:

> It is the interest of [the] sovereign ... to open the most extensive market for the produce of his country, to allow the most perfect freedom of commerce, in order to increase as much as possible the number and the competition of buyers; and upon this account to abolish, not only all monopolies, but all restraints upon the transportation of the home produce from one part of the country to another.... He is in this manner

Star State lauds economic dynamism. And while it is perhaps natural for a profit-maximizing company to bend toward collusive or monopolistic restriction,[23] Texas law is hostile to such noncompetitive impulses. Nor can it be doubted that some companies try to tilt the playing field via dubious noncompete covenants, even facially unenforceable ones, knowing that even the *specter* of enforcement action will chill employees (and their potential employers) into preemptive capitulation.[24]

Given this firm foundation, courts' broad discretion in scrutinizing noncompetes, and the Legislature's clearly stated opposition to contracts that unduly restrain competition, I would underscore that a noncompete rooted in protectionism alone is per se invalid under the Covenants Not to Compete Act and surely offends the Act's purpose of giving Texans the benefits of competition that is fierce yet also fair. Restraint of trade for its own sake is not a protectable "business interest" under Section 15.50, any more than violations of employee wage, hour, or safety laws are

legitimate business interests that can be protected through a restrictive covenant.

More to the point, while "goodwill" is a bona fide business interest under the Act, it is not enough merely to mutter the word. You cannot simply buy a covenant not to compete. A court cannot uphold a noncompete on goodwill grounds absent a record that demonstrates the limitations are reasonable and as nonburdensome as possible. Every company has customer relationships and attendant goodwill it wants to cultivate by incentivizing employees to stay, but merely *asserting* goodwill is not enough. Marsh contends "Cook could take the customer relationships grown as a result of the stock incentive and use them to compete with Marsh,"[25] but that unadorned assertion is insufficient. And even assuming the incentive spurred Cook to grow Marsh's goodwill (which strikes me as a curious and slippery proposition), does that prove too much, lest any workplace benefit—a bonus, a raise, a promotion, a better parking space—suffice to justify a noncompete because it theoret-

most likely to increase both the quantity and value of that produce, and consequently of his own share of it, or of his own revenue.
ADAM SMITH, THE WEALTH OF NATIONS: BOOK II 411–12 (P.F. Collier & Son 1902) (1776). Similarly, the domino effect that would result from permitting such restraints to remain cannot be understated. *See id.* at 371 ("[A monopoly] not only hinders, at all times, ... capital from maintaining so great a quantity of productive labor as it would otherwise maintain, but it hinders it from increasing so fast as it would otherwise increase, and consequently from maintaining a *still* greater quantity of productive labor.").

23. *See id.* at 412 ("Their mercantile habits draw [merchants] in this manner, almost necessarily, though perhaps insensibly, to prefer upon all ordinary occasions the little and transitory profit of the monopolist to the great and permanent revenue of the sovereign....").

24. *See infra* note 40 and related text. Some legal commentators are unsubtle in their market-based objections to non-solicitation agreements specifically:

As to the non-solicitation of customers, such covenants are monopolistic and overreaching. What if the customer would prefer to do business with the former employee, or at least seek a competing price quote, but does not know that the former employee has resigned and started a new business? Something is amiss when consenting businesses cannot transact business together, merely because another business got there first. As with non-competition covenants generally, such contracts appear to restrict competitive activities that might lower prices, provide better services for customers, and allow businesses to partner together where that might be most productive.
Graves and DiBoise, *Strict Trade Secret and Non–Competition Laws*, at 334.

25. Pet. Br. at 31.

ically motivates an employee to strengthen client relationships? The evidentiary record must demonstrate special circumstances beyond the bruises of ordinary competition such that, absent the covenant, Cook would possess a grossly unfair competitive advantage. And even then the restrictions imposed must be as light as possible and not restrict Cook's mobility to an extent greater than Marsh's legitimate need.

*Second*, naked restraints of trade are particularly onerous because, besides stifling beneficial competition, they also meddle with people's right to earn an honest living. Sixty-five years ago, we declared the right to use one's "own labor in any lawful employment ... one of the first and highest of civil rights."[26] The right to pursue a chosen occupation and career path is indeed highly cherished, but it is also highly vulnerable. For many people, their livelihood is inextricably tied to a certain pursuit of happiness, and losing this liberty should never be lightly regarded. Fittingly, courts have recognized a right to work of constitutional dimension, at least in cases where state action was alleged. Nearly a century ago, the United States Supreme Court explained that "the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure."[27] The Court made a similar point around that time in a case arising from Texas:

> In so far as a man is deprived of the right to labor, his liberty is restricted, his capacity to earn wages and acquire property is lessened, and he is denied the protection which the law affords those who are permitted to work. Liberty means more than freedom from servitude, and the constitutional guaranty is an assurance that the citizen shall be protected in the right to use his powers of mind and body in any lawful calling.[28]

Such eloquence has spanned centuries. Saint Thomas Aquinas addressed the connection between work and existence itself: "[I]t is natural to a man to love his own work (thus it is to be observed that poets love their own poems); and the reason is that we love to be and to live, and these are made manifest especially in our action."[29] Ralph Waldo Emerson, typically transcendentalist, called it "the high prize of life, the crowning fortune of a man ... to be born with a bias to some pursuit, which finds him in employment and happiness,—whether it be to make baskets, or broadswords, or canals, or statues, or songs."[30] Voltaire took the utilitarian, albeit narrow, view: "[O]ur labour keeps off from us three great evils," he said, "idle-

---

**26.** *Int'l Printing Pressmen & Assistants' Union of N. Am. v. Smith*, 145 Tex. 399, 198 S.W.2d 729, 740 (1946) (Brewster, J., dissenting).

**27.** *Truax v. Raich*, 239 U.S. 33, 41, 36 S.Ct. 7, 60 L.Ed. 131 (1915) (citations omitted). *See also Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 572, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972) (recognizing the right "to engage in any of the common occupations of life" as a constitutional liberty interest); *Stidham v. Tex. Comm'n on Private Sec.*, 418 F.3d 486, 491 (5th Cir.2005) ("We have confirmed the principle that one has a constitutionally protected liberty interest in pursuing a chosen occupation.") (citations omitted).

**28.** *Smith v. Texas*, 233 U.S. 630, 636, 34 S.Ct. 681, 58 L.Ed. 1129 (1914).

**29.** 2 ST. THOMAS AQUINAS, SUMMA THEOLOGICA pt. II, q. 26, art. 12, at 519 (Fathers of the English Dominican Province trans., Daniel J. Sullivan rev., Encyclopedia Britannica, Inc. 1952) (1265–74).

**30.** RALPH WALDO EMERSON, CONDUCT OF LIFE 234 (1860).

ness, vice, and want."[31] We would be unwise not to linger where a priest, a poet, and a polemicist all miraculously agree. Where the judiciary is empowered to pass upon a subject that so viscerally affects the citizenry, it should *do so with utmost care.* Sometimes that care will demand a painstaking weighing of interests. In other moments, it will demand that certain constraints—those that restrict the right to work for no better reason than to erase the competition a company sought by entering the marketplace—be declared categorically void. In *all* cases, it requires chary judges who respect our law's rootedness in economic liberty and vitality.

This is doubly true in times of economic hardship. President Franklin Roosevelt's first inaugural address is largely remembered for the iconic phrase, "the only thing we have to fear is fear itself"[32]—a potent sound bite that is often removed from the crucial context that surrounded it. The fear President Roosevelt spoke about in 1933 sprang largely from the financial crater left by the Great Crash of 1929 and the agonizing Great Depression that followed. The Depression's devastating effects prompted the new president to couple his discussion of fear with an emphasis on the salve to that fear: the importance of "[t]he joy and moral stimulation of work."[33] It was the process—the act of committing oneself—that mattered. "Happiness lies not in the mere possession of money," he explained, "it lies in the joy of achieve-

ment, in the thrill of creative effort."[34] The virtue of work is no less fundamental today. Companies must tread lightly when undertaking to curb that liberty. And if employers pass uncalled-for limits, we call on judges to pass upon them.

The "true beginning of the modern law"[35] on post-employment restraints is *Mitchel v. Reynolds,*[36] a 1711 English-court decision that stood as the most cited case on the subject for two-and-a-half centuries.[37] While introducing the so-called "rule of reason" for evaluating such agreements—whether a legitimate economic or business purpose justified the restriction[38]—*Mitchel* expressed concern that such agreements were subject to "great abuses ... from masters, who are apt to give their apprentices much vexation on this account, and to use many indirect practices to procure such bonds from them, lest they should prejudice them in their custom, when they come up to set up for themselves."[39] Though the contours of non-compete doctrine have changed as the American economy has changed, this astute observation merits remembering. The "vexation" feared in 1711 is no less real 300 years later. In 2011, overbroad restrictions can strain the gears of an economic engine that has propelled this country so well, and so far. In 2011, terms too severe to be enforced can also escape challenge altogether, instead acting *in terrorem* to freeze an untold number of employees in place rather than allowing human

---

31. VOLTAIRE, CANDIDE 119 (Samuel Johnson ed., George Rutledge and Sons 1884) (1694).

32. President Franklin D. Roosevelt, First Inaugural Address (Mar. 4, 1933).

33. *Id.*

34. *Id.*

35. 8 SIR WILLIAM S. HOLDSWORTH, A HISTORY OF ENGLISH LAW 60 (2d ed.1973).

36. (1711) 24 Eng. Rep. 347 (Q.B.); 1 P. Wms. 181.

37. Blake, *Employee Agreements,* at 629.

38. *See* Moffat, *The Wrong Tool,* at 880.

39. *Mitchel,* 24 Eng. Rep. at 350; 1 P. Wms. at 190.

capital to find its highest and best use and thus augment economic and technological growth.[40] This seems especially notable in today's era of dizzying technological change, when implicit lifetime tenure is obsolete and frequent job-hopping is ordinary (unless someone has been forced to sign away his or her right to compete).[41]

Restrictive covenants are not costless, and even a mutually acceptable noncompete can impose a deadweight loss on broader society. Courts should not confuse a noncompete's impact on the employee with its impact on competition. A restraint may be perfectly agreeable to both parties today but still harm consumers tomorrow. Moreover, as our economy becomes even more technologically advanced and knowledge-based (key contributors to a so-called high-velocity labor market), overreaching restrictions lock up human capital and decelerate the beneficial knowledge spillover that accrues from greater mobility. It remains the job of courts to be vigilant for practices that tend to servility, that deprive the public of desired services, and that quash rivals via forced restriction rather than forceful competition.[42]

\* \* \*

I recognize that a free market is not innately utopian, with frictionless edges that never need sanding. "If men were angels, no government would be necessary,"[43] much less antitrust laws to curb monopolistic impulses. Under Texas law, we must dutifully enforce noncompetes that impose reasonable limitations that are no more restrictive than necessary in order to advance legitimate business interests. But this duty requires circumspection, lest the "Covenants Not to Compete Act" exception swallow the "Free Enterprise and Antitrust Act" rule. The latter

---

40. *See* Cynthia L. Estlund, *Between Rights and Contract: Arbitration Agreements and Non–Compete Covenants as a Hybrid Form of Employment Law*, 155 U. Pa. L.Rev. 379, 406 (2006) ("An overbroad non-compete—one that lasts too long or that covers activities that do not threaten the employer's legitimate interests—may deter the employee from quitting and competing even when she has a right to do so, or it may deter a competitor from hiring the employee."). The *in terrorem* effect is magnified in jurisdictions like Texas, where judges simply "blue pencil" overbroad noncompetes to make them enforceable. *See* Tex. Bus. & Com.Code § 15.51(c); *e.g.*, *Prod. Action Int'l, Inc. v. Mero*, 277 F.Supp.2d 919, 931 (S.D.Ind.2003) ("A current employee may be frozen in his or her job by an unreasonably broad covenant. Even if the employee believes the covenant is too broad, she may be able to test that proposition only through expensive and risky litigation."); *Richard P. Rita Pers. Servs. Int'l, Inc. v. Kot*, 229 Ga. 314, 191 S.E.2d 79, 81 (1972) ("If severance is generally applied, employers can fashion truly ominous covenants with confidence that they will be pared down and enforced when the facts of a particular case are not unreasonable.").

41. Noncompetes also shelter struggling companies that are facing headwinds of recession or industry turmoil. An at-will employee might see dire times ahead for the company but is unable to find new employment if the prospect of litigation spooks the employee or a potential new employer. "As a result, the individual may lose opportunities to advance her career and compensation, and the employer may be able to insulate itself at least temporarily from the competition of more vibrant enterprises for productive employees." Kate O'Neill, *"Should I Stay or Should I Go?"—Covenants Not to Compete in a Down Economy: A Proposal for Better Advocacy and Better Judicial Opinions*, 6 Hastings Bus. L.J. 83, 118 (Winter 2010).

42. Burdens on inter-firm mobility are especially acute in a fast-paced and tumultuous 21st-century economy. Greater mobility would, one suspects, spur, not curb, the pace of high-tech advances and the dissemination of ideas and knowledge.

43. The Federalist No. 51 (James Madison).

sides with the virtues of economic liberty—the basic right to pursue what you choose, where you choose, and among whom you choose—not the vice of unduly denying skilled people the rewards of their earned success or injuring society by depriving the wider public of someone's talents and enterprise. So while free enterprise recognizes—*demands,* actually—that economic actors will doggedly pursue self-interest, Texas noncompete law recognizes the difference between constructive self-interest and destructive selfishness. Where a naked restraint of trade masquerades as a covenant not to compete, we must strike it down—always.

Summing up: Post-employment restrictions are restraints on trade and, as such, deserve rigorous legal scrutiny, particularly given today's pace of warp-speed economic change. Noncompetes tailored to protectable business interests have their lawful place, but they should be used sparingly and drafted narrowly. And employers must demonstrate special facts that legitimize the noncompete agreement. Squelching competition for its own sake is an interest unworthy of protection. Competition by a former employee may well rile an employer, but companies do not have free rein to, by contract, indenture an employee or dampen everyday competition that benefits Texas and Texans.

Justice GREEN, joined by Chief Justice JEFFERSON and Justice LEHRMANN, dissenting.

The Court today decides that a non-solicitation agreement extracted from an employee in exchange for stock options can be enforceable solely because the employer's goodwill, which purportedly benefits from the gift of stock options, is an interest worthy of protection. 354 S.W.3d

764, 780. This decision is directly at odds with our holding in *Light v. Centel Cellular Co.,* 883 S.W.2d 642 (Tex.1994), which required that an employer's consideration for a covenant not to compete must give rise to an interest in restraining trade. Yet the Court refuses to say that it is overruling *Light.* While I agree that goodwill is an interest worthy of protection—the Covenants Not to Compete Act expressly refers to goodwill as a protectable interest[1]—the enforceability of this covenant does not hinge upon that determination. It hinges upon *consideration*—whether stock options given to an employee can justify a restraint of trade. The Act mentions nothing about stock options, and equating stock options with goodwill creates a rule by which any financial incentive given to an employee could justify a covenant not to compete. Our law prior to *Light,* and since, has applied the rule that covenants not to compete must be ancillary to an exchange of valuable consideration that justifies or necessitates a restraint of trade. *See, e.g., Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 849 (Tex.2009) (holding that unless the consideration given by the employer gives rise to an interest in restraining competition and the covenant is designed "to enforce the employee's consideration or return promise[,] ... the covenant is a naked restraint of trade and unenforceable"); *Justin Belt Co. v. Yost,* 502 S.W.2d 681, 683 (Tex.1973) (holding that a restraint of trade must be "ancillary to and in support of another contract"). Because today's decision nullifies that requirement, and favors the enforcement of covenants not to compete based on financial incentives (something we've repeatedly held is unacceptable), I respectfully dissent.

---

1. Tex. Bus. & Com.Code § 15.50(a) (referring to an enforceable covenant as one that is created

to protect "goodwill or other business interest[s]").

The Court today abandons our previous application of the "ancillary to or part of" requirement codified in Texas Business and Commerce Code § 15.50(a) and instead defines the phrase as "reasonably related to." *See* 354 S.W.3d at 780. If the Legislature intended for enforceability of a covenant not to compete to depend upon whether the covenant was "reasonably related to an otherwise enforceable agreement," the Legislature could have easily chosen such language. Instead, the Legislature used a phrase from the common law prior to *Light. See DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 681–82 (Tex. 1990) (explaining the established common law principles governing covenants not to compete); RESTATEMENT (SECOND) OF CONTRACTS §§ 187, 188 (1981). *Light*'s application of the consideration prong of the statute, far from being a departure from the common law, seems consistent with the "relatively well established" common law as expressed in *DeSantis*, where we held that an enforceable covenant not to compete must be "ancillary to an otherwise valid transaction or relationship,"[2] and that under this requirement, a "restraint on competition is unreasonable unless it is part of and subsidiary to an otherwise valid transaction or relationship which *gives rise* to an interest worthy of protection." *DeSantis*, 793 S.W.2d at 681–82 (emphasis added). In *Light*, we held that under Texas Business and Commerce Code § 15.50, in order for a covenant to be "ancillary to an otherwise enforceable agreement": (1) "the consideration given by the employer in the otherwise enforceable agreement must *give rise* to the employer's interest in restraining the employee from competing; and (2) the covenant must be designed to enforce the employee's consideration or return promise in the otherwise enforceable agreement." 883 S.W.2d at 647 (emphasis added). The Court today holds that "*Light* diverged from the common law definition of 'give rise' as articulated in *DeSantis*," stating that "[r]ather than requiring that the otherwise enforceable agreement give rise to 'an interest worthy of protection,' *Light* imposed a stricter requirement: that the consideration give rise to 'the employer's interest in restraining the employee from competing.'" 354 S.W.3d at 773–74 (emphasis omitted). I fail to see the difference between "an interest worthy of protection" (in this case, Marsh's goodwill), and "the employer's interest in restraining the employee from competing" (in this case, Marsh's protection of goodwill). I also fail to see how the Court can defend the "give rise" language of *DeSantis* and overrule, or "modify," the "give rise" language as used in *Light*, which relied on the language of *DeSantis. See Light*, 883 S.W.2d at 647. As the Court points out, the Act was intended to codify the common law;[3] therefore, the Act should also incorporate our common law interpretations of the term "ancillary to or part of." The Court's main problem with the "give rise" standard appears to be this: Stock options do not give rise to an interest in restraining trade, and therefore, the give rise standard cannot accompany the enforcement of a covenant based on stock options.

Goodwill is not the dispute in this case. The dispute is whether the *consideration* given to allegedly protect the employer's goodwill gives rise to an interest in re-

---

**2.** *See also Justin Belt Co.*, 502 S.W.2d at 683 (holding that a restraint of trade must be "ancillary to and in support of another contract").

**3.** 354 S.W.3d at 772 (citing *Alex Sheshunoff Mgmt. Servs., L.P. v. Johnson*, 209 S.W.3d 644, 653 (Tex.2006) (quoting House Research Org., Bill Analysis, Tex. S.B. 946, 71st Leg., R.S. (1989))).

straining competition. There is no evidence in the record of whether Cook actually created goodwill for Marsh or whether he used any goodwill in competition with Marsh, circumstances remarkably similar to *DeSantis.* *See DeSantis,* 793 S.W.2d at 683–84.[4] Any financial incentive given to an employee can arguably motivate the employee to increase his employer's goodwill, and every employee, if he performs his job as expected, creates goodwill for his employer. If any financial incentive that can encourage an employee to create more goodwill can satisfy the consideration prong of the Act, then we might as well ignore the consideration requirement all together. Under the Court's reasoning, a raise, a bonus, or even a salary could support an enforceable covenant.

Noticeably missing in § 15.50(a) is language enforcing a covenant ancillary to an employment "relationship," which is the language of the Restatement. *See* RESTATEMENT (SECOND) OF CONTRACTS § 188 (1981); *Sheshunoff,* 209 S.W.3d at 653–54 (tracking the evolution of the Act and how the Legislature rejected a version that would have enforced covenants "ancillary to an otherwise valid transaction or *relationship*" (emphasis added)). A mere employment relationship is not enough under the statute, which requires a separate enforceable agreement, but under today's ruling, it very well could be. *See* TEX. BUS. & COM.CODE § 15.50(a). Financial compensation accompanies virtually every form of employment.[5] Under the Court's ruling,

4. The Court seems to characterize *DeSantis* as a case dealing solely with confidential information. *See* 793 S.W.3d at 772. *DeSantis* was also a case about protecting goodwill, where we held that the evidence supporting the existence and misappropriation of goodwill was insufficient and that the covenant was therefore unenforceable. *See* 793 S.W.2d at 683–84. Wackenhut, like Marsh in this case, argued that the employee had created goodwill for the company and had used that goodwill to attract clients to a competitor. *Id.* at 683. Despite recognizing goodwill as an "interest worthy of protection," we held that Wackenhut failed to produce enough evidence that DeSantis actually increased Wackenhut's goodwill or "that he did or even could divert that goodwill to himself for his own benefit after leaving Wackenhut." *Id.* at 682–83 (considering that at least one of Wackenhut's clients had left Wackenhut to give business to DeSantis's new employer).

5. While goodwill is an interest worthy of protection, under the common law, it's valuation and protection applies more in the sale of a business than the restriction of a former employee:

> The extent to which the restraint is needed to protect the promisee's interests will vary with the nature of the transaction. Where a sale of good will is involved, for example, the buyer's interest in what he has acquired cannot be effectively realized un-

less the seller engages not to act so as unreasonably to diminish the value of what he has sold. The same is true of any other property interest of which exclusive use is part of the value. In the case of a postemployment restraint, however, the promisee's interest is less clear. Such a restraint, in contrast to one accompanying a sale of good will, is not necessary in order for the employer to get the full value of what he has acquired. Instead, it must usually be justified on the ground that the employer has a legitimate interest in restraining the employee from appropriating valuable trade information and customer relationships to which he has had access in the course of his employment. Arguably the employer does not get the full value of the employment contract if he cannot confidently give the employee access to confidential information needed for most efficient performance of his job. But it is often difficult to distinguish between such information and normal skills of the trade, and preventing use of one may well prevent or inhibit use of the other. Because of this difference in the interest of the promisee, courts have generally been more willing to uphold promises to refrain from competition made in connection with sales of good will than those made in connection with contracts of employment.

RESTATEMENT (SECOND) OF CONTRACTS § 188 cmt. b (1981). The distinction between what type

the otherwise enforceable agreement could well be an agreement as to compensation. The Legislature expressly decided there must be an otherwise enforceable transaction, and in *DeSantis* and *Light*, we held that the transaction itself needs to create an interest worthy of protection and in restraining trade, or else the covenant is an unenforceable naked restraint of trade. *See Light*, 883 S.W.2d at 647; *DeSantis*, 793 S.W.2d at 682 (referring to "unreasonable" restraints on competition as those that are not "part of and subsidiary to an otherwise valid transaction or relationship which gives rise to an interest worthy of protection"). To argue that Cook created goodwill for Marsh that he would not have created absent stock options is not only incapable of being proven, but blurs the true issue. The true issue is that Texas courts have stated time and again that an employer cannot *buy* a covenant not to compete, and the Court's decision allows

Marsh and other employers to do exactly that.[6]

The Court cannot rely on the second prong of § 15.50(a) to ensure that covenants which are "unreasonable" will not be enforced. Under the express language of the statute, only the first prong—the consideration prong—determines whether covenants are enforceable, while reasonableness defines only *the extent* to which they are enforceable. Tex. Bus. & Com. Code §§ 15.50(a), 15.51(c) (stating that "[i]f the covenant is found to be ancillary to or part of an otherwise enforceable agreement ... but contains limitations ... that are not reasonable and impose a greater restraint than is necessary," then the court "shall reform the covenant"). Therefore, the only method by which a covenant is unenforceable as a matter of law is when it is not ancillary to or part of an otherwise enforceable agreement. De-

---

of agreement is enforceable to protect goodwill in the context of the sale of a business and the context of post-employment restriction is unaddressed by § 15.50, which applies to both contexts. *But see Hill v. Mobile Auto Trim, Inc.*, 725 S.W.2d 168, 177 (Tex.1987) (Gonzalez, J., dissenting) (noting that Texas courts "scrutinize covenants not to compete in employment relationships more closely than covenants not to compete associated with the sale of a business"). Regardless, an employer's assertion of goodwill as the interest being protected does not end the inquiry, even under the consideration prong of the statute. How that employer protects its goodwill, and what it gives its employee in exchange for a covenant not to compete, are what matters. Here, Marsh's reasons for giving stock options are irrelevant; stock options do not justify a restraint of trade.

6. *See, e.g., Sheshunoff*, 209 S.W.3d at 650 (holding that allowing an employer to enforce a covenant "merely by promising to pay a sum of money" would be "inconsistent with *Light*'s requirements"); *Valley Diagnostic Clinic v. Dougherty*, 287 S.W.3d 151, 157 (Tex.App.-Corpus Christi 2009, no pet.) ("A compensation provision made only in exchange for a non-compete promise is precise-

ly the sort of restraint of trade that Texas law prohibits."); *Trilogy Software, Inc. v. Callidus Software, Inc.*, 143 S.W.3d 452, 463 (Tex.App.-Austin 2004, pet. denied) ("[F]inancial benefits do not give rise to an 'interest worthy of protection' by the covenant not to compete."); *Strickland v. Medtronic, Inc.*, 97 S.W.3d 835, 839 (Tex.App.-Dallas 2003, pet. dism'd w.o.j) (holding that the employer's promise to compensate the employee "in the event of economic hardship resulting from the non-compete agreement" did not give rise to an interest worthy of protection); *see also, e.g., Oxford Global Res., Inc. v. Weekley–Cessnun*, No. Civ.A. 3:04–CV–0330, 2005 WL 350580, *4 n. 8 (N.D.Tex. Feb. 8, 2005) (mem. op.) ("[S]tock options do not give rise to an employer's interest in restraining competition or solicitation."); *Olander v. Compass Bank & Compass Bancshares, Inc.*, 172 F.Supp.2d 846, 855 (S.D.Tex.2001) (explaining that the employer failed to "articulate[ ] any coherent theory explaining how [a] promise ... to grant the right to buy stock at a set price ... gives rise to an interest in restraining [the employee] from competing *after* he has left [the employer]").

spite the dicta of *Sheshunoff* defining reasonableness as the core inquiry in that case, the consideration prong remains an equally crucial inquiry under the Act, and its application is rendered meaningless by the Court's decision to concoct a new, broad definition of "ancillary or part of" as "reasonably related to."

The Legislature has not clarified or altered the meaning of the term "ancillary" since the Court defined it in *Light* seventeen years ago. Stare decisis applies with greater force to statutory construction for this very reason. *Sw. Bell Tel. Co. v. Mitchell,* 276 S.W.3d 443, 447 (Tex.2008) (" '[I]n the area of statutory construction, the doctrine of stare decisis has its greatest force' because the Legislature can rectify a court's mistake, and if the Legislature does not do so, there is little reason for the court to reconsider whether its decision was correct." (quoting *Marmon v. Mustang Aviation, Inc.,* 430 S.W.2d 182, 186 (Tex.1968))). If Legislative intent were thwarted by our decision in *Light,* as the Court claims, the Legislature could have clarified its meaning of "ancillary to or part of" at some point during the past seventeen years.[7] "It is a firmly established statutory construction rule that once appellate courts construe a statute and the Legislature re-enacts or codifies that statute without substantial change, we presume that the Legislature has adopted the judicial interpretation." *Grapevine Excavation, Inc. v. Md. Lloyds,* 35 S.W.3d 1, 5 (Tex.2000) ("Stare decisis has its greatest force in statutory construction cases."). The Legislature has amended other portions of the Covenants Not To Compete Act three times in the seventeen years since *Light* and has not changed the wording or meaning of the phrase "ancillary to or part of" since our application of the phrase in *Light.* Act of May 26, 1999, 76th Leg., R.S., ch. 1574, § 1, 1999 Tex. Gen. Laws 5408, 5408 (adding subsection (b) concerning physicians and covenants not to compete); Act of May 22, 2001, 77th Leg., R.S., ch. 1420, § 14.729, 2001 Tex. Gen. Laws 4210, 4515 (amending subsection (b)); Act of May 26, 2009, 81st Leg., R.S., ch. 971, § 1, 2009 Tex. Gen. Laws 2565, 2565 (amending subsection (b)).

Under this "firmly established statutory construction rule," we must presume the Legislature has adopted our previous definition of "ancillary to or part of" under the Act. *See Grapevine Excavation, Inc.,* 35 S.W.3d at 5. By instead concocting a more expansive definition of "ancillary to or part of" based on Black's and Webster's dictionaries, the Court ignores the will of the Legislature and the well established principles of stare decisis. *See generally Sw. Bell Tel. Co.,* 276 S.W.3d at 447 ("Generally, the doctrine of stare decisis dictates that once the Supreme Court announces a proposition of law, the decision is considered binding precedent." (internal quotation omitted)); *Grapevine Excavation, Inc.,* 35 S.W.3d at 5. Despite the Court's assertion that we have consistently disapproved of the holding in *Light,* our cases on covenants not to compete since *Light* have merely liberalized *Light*'s holding so that the *timing* of consideration given for a covenant not to compete is no longer a technical concern. *See Mann Frankfort,* 289 S.W.3d at 851–53 (holding that a promise to provide confidential information can be implied from a covenant when confidential information is later provided); *Sheshunoff,* 209 S.W.3d at 650, 655 (holding that

---

7. As the Court points out, the Legislature is capable of correcting our pronouncements on covenants not to compete that it disagrees with, as it passed the Act in 1989 to overturn our decision in *Hill v. Mobile Auto Trim, Inc.,* 725 S.W.2d 168 (Tex.1987), within two years of its issuance. *See* 354 S.W.3d at 772.

we should focus less on "overly technical disputes" engendered by *Light*'s footnote six regarding whether the consideration was transferred to the employee at the *time* of the agreement). Yet none of the Court's decisions since *Light* have questioned the rule requiring consideration for a covenant not to compete to give rise to an interest in restraining trade. *See Mann Frankfort*, 289 S.W.3d at 851–53; *Sheshunoff*, 209 S.W.3d at 649 ("We do not disturb the holding in *Light*."). In this case, unlike those others, we deal with the very nature of the consideration itself, and not its quantity, timing, or degree. This is not the type of overly technical dispute that *Sheshunoff* warned against. *See* 209 S.W.3d at 655–56 (listing, in dicta, that "the amount of information an employee has received, its importance, its true degree of confidentiality, and the time period over which it is received ... are better addressed in determining whether and to what extent a restraint on competition is justified" rather than whether the covenant is enforceable).

Whether stock options constitute valid consideration is an essential inquiry under the prong of the statute requiring that the agreement be "ancillary to or part of an otherwise enforceable agreement." The fact that the Court now holds stock options satisfy this prong ignores the consensus amongst Texas courts that mere financial compensation as consideration will not support an enforceable restraint of trade. *See, e.g., id.* at 650 (holding that allowing an employer to enforce a covenant "merely by promising to pay a sum of money" would be "inconsistent with *Light*'s requirements"); *Valley Diagnostic Clinic v. Dougherty*, 287 S.W.3d 151, 157 (Tex.App.-Corpus Christi 2009, no pet.) ("A compensation provision made only in exchange for a non-compete promise is precisely the sort of restraint that Texas law prohibits."); *Trilogy Software, Inc. v. Callidus*

*Software, Inc.*, 143 S.W.3d 452, 463 (Tex. App.-Austin 2004, pet. denied) ("[F]inancial benefits do not give rise to an 'interest worthy of protection' by the covenant not to compete."); *Strickland v. Medtronic, Inc.*, 97 S.W.3d 835, 839 (Tex.App.-Dallas 2003, pet. dism'd w.o.j) (holding that the employer's promise to compensate the employee "in the event of economic hardship resulting from the non-compete agreement" did not give rise to an interest worthy of protection); *see also, e.g., Oxford Global Res., Inc. v. Weekley–Cessnun*, No. Civ.A. 3:04–CV–0330, 2005 WL 350580, *4 n. 8 (N.D.Tex. Feb. 8, 2005) (mem.op.) ("[S]tock options do not give rise to an employer's interest in restraining competition or solicitation."); *Olander v. Compass Bank & Compass Bancshares, Inc.*, 172 F.Supp.2d 846, 855 (S.D.Tex.2001) (explaining that the employer failed to "articulate[ ] any coherent theory explaining how [a] promise ... to grant the right to buy stock at a set price ... gives rise to an interest in restraining [the employee] from competing *after* he has left [the employer]"). Marsh cannot point to one thing of value that it gave Cook which now allows him to compete unfairly and which necessitates a restraint of trade. The affidavit submitted by Sally Dillenback, head of Marsh's Dallas office, explained that Marsh intended to make its valued employees owners so that they would contribute greater efforts to increase Marsh's goodwill. 354 S.W.3d at 776. Giving this affidavit any weight ignores the fact that the relevant question under this Court's precedent is whether the consideration given by the employer for the covenant not to compete—not the employer's motivation or some other characteristic of the agreement or events leading up to the transaction—gives rise to an interest in restraining competition. *See Mann Frankfort*, 289 S.W.3d at 849; *Sheshunoff*, 209 S.W.3d

at 648–49; *Light,* 883 S.W.2d at 647. *Why* consideration was given has never mattered so much as *what* was given. Trade secrets, confidential information, and special training are all forms of consideration that we have recognized may give rise to an interest in restraining trade. *See Mann Frankfort,* 289 S.W.3d at 852 (confidential information); *Sheshunoff,* 209 S.W.3d at 649–50 (confidential information and specialized training); *Light,* 883 S.W.2d at 647 n. 14 (trade secrets). They are given to an employee for one reason: to allow the employee to perform his job better. They make the employee more valuable to the company, and more valuable to other companies, which is why they justify covenants not to compete.[8] An employee who receives deferred compensation or similar benefits is not in a better position to compete against his employer than an employee who has not received such benefits. Stock options are not a form of consideration this Court has ever held may support such a covenant.[9] Allowing employers to obtain covenants not to compete by providing such financial incentives without actually giving the employee anything that gives rise to an interest in restraining trade is bad policy for Texas, and will make covenants not to compete much more commonplace in instances where there is little risk of unfair competition. The "give rise" requirement ensures that an employer seeking to restrain competition has given consideration for the covenant that fairly necessitates a restraint of trade, while respecting the fundamental tenet that at-will employment otherwise permits employees to put their talents to fair, competitive use elsewhere. *See Sheshunoff,* 209 S.W.3d at 659 (Jefferson, C.J., concurring) (explaining that only a covenant that protects a "legitimate business interest" is enforceable because it is consequently "not a direct restraint of trade in violation of public policy"); *see also* TEX. BUS. & COM.CODE § 15.04 (explaining that the purpose of Chapter 15 is to "maintain and promote economic competition in trade and commerce").

8. In this case there was no transfer to Cook of anything that allowed him to perform his job better or be more competitive against Marsh; as Marsh admits, "in the insurance brokerage business, because the products and services offered by brokers are largely the same, the ability to develop quality customer relationships" is what truly sets one firm apart from another. What Marsh does not address, however, is that in this situation, non-compete agreements may simply be a cheaper alternative to paying a higher salary or bonus. The Court recognizes that Texas clearly disfavors the use of non-compete agreements for such a purpose. *See* 354 S.W.3d at 769 (citing *Potomac Fire Ins. Co. v. State,* 18 S.W.2d 929, 934 (Tex.Civ.App.-Austin 1929, writ ref'd) (holding that a contract between two insurance companies to limit compensation was unenforceable as it was intended to "crush and destroy competition")).

9. *See Sheshunoff,* 209 S.W.3d at 660 (explaining that the consideration is usually of the type that increases the employee's market value by, for example, giving the employee "special knowledge and skills" that "increase [the employee's] value and compensation"). "The covenant, in turn, ensures that the costs incurred to develop human capital are protected against competitors who, having not made such expenditures, might offer higher salaries to employees and thereby appropriate the employer's investment." *Id.* Stock options do not develop the kind of human capital that can be taken by competitors, nor do they develop "special knowledge and skills." While stock options could motivate an employee to create goodwill, thus increasing the value of the interest worthy of protection, they don't themselves create an interest worthy of protection. The fact that an employee makes his employer's net worth grow does not alone justify a restraint of trade absent the employer's investment in making the employee more valuable to competitors. The employee is no more valuable to competitors after he receives stock options in the way that he would be after he receives special training, trade secrets, or confidential information.

Lastly, if we are to ignore the doctrine of stare decisis, we must at least give trial courts some guidance in the enforcement of covenants not to compete, lest we face the multitude of issues raised by our new definition of "ancillary to or part of" in the coming years.[10]

The Court's new rule not only thwarts the legislative intent behind § 15.50, but also contradicts the strong policy goals inherent in Chapter 15, which protect the interests of free trade and a competitive market. *See* TEX. BUS. & COM.CODE § 15.04 ("The purpose of this Act is to maintain and promote economic competition in trade and commerce ... and to provide the benefits of that competition to consumers in the state. The provisions of this Act shall be construed to accomplish this purpose...."). For this reason, I dissent.

---

**10.** Stare decisis "results in predictability in the law, which allows people to rationally order their conduct and affairs." *Grapevine Excavation, Inc.*, 35 S.W.3d at 5. "[I]n most matters it is more important that the applicable rule of law be settled than that it be settled right." *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 139, 128 S.Ct. 750, 169 L.Ed.2d 591 (2008) (quoting *Burnet v. Coronado Oil & Gas Co.*, 285 U.S. 393, 406, 52 S.Ct. 443, 76 L.Ed. 815 (1932) (Brandeis, J., dissenting)). "To overturn a decision settling one such matter simply because we might believe that decision is no longer 'right' would inevitably reflect a willingness to reconsider others. And that willingness could itself threaten to substitute disruption, confusion, and uncertainty for necessary legal stability." *Id.* "[I]f we did not follow our own decisions, no issue could ever be considered resolved. The potential volume of speculative relitigation under such circumstances alone ought to persuade us that stare decisis is a sound policy." *Weiner v. Wasson*, 900 S.W.2d 316, 320 (Tex.1995).