Opinion issued March 18, 2014



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00798-CV

————————————

## ALLIANTGROUP, L.P., Appellant

## V.

## KARIM SOLANJI, ZEESHAN MAKHANI, SAQIB DHANANI, PARADIGM NATIONAL CONSULTANTS, L.P., PARADIGM SMD GROUP, L.L.C., AND PARADIGM PARTNERS, L.P., Appellees

---

**On Appeal from the 125th District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-62874**

---

## MEMORANDUM OPINION

Appellant, Alliantgroup, L.P. ("Alliantgroup"), sued appellees, Karim

Solanji, Zeeshan Makhani, Saqib Dhanani, Paradigm National Consultants, L.P.,

Paradigm SMD Group, L.L.C., and Paradigm Partners, L.P. (collectively,

"Paradigm"), asserting claims for breach of contract and tortious interference with contracts. Paradigm moved for no-evidence summary judgment, which the trial court granted. Alliantgroup appeals the trial court's granting of Paradigm's no-evidence motion for summary judgment, arguing that the trial court erred because the record contained more than a scintilla of evidence that (1) Paradigm breached the parties' settlement agreement and (2) Paradigm tortiously interfered with Alliantgroup's business relationships.

We affirm.

## Background

Alliantgroup conducts research and development tax credit studies ("R&D studies") for businesses in Texas and other locations. Solanji, Makhani, and Dhanani worked for Alliantgroup until 2006, when they left Alliantgroup and formed Paradigm National Consultants, L.P. *d/b/a* Paradigm Partners. In August 2006, Alliantgroup sued Solanji, Makhani, and Dhanani, claiming that they used Alliantgroup's trade secrets without permission for the purpose of unfair competition. On February 21, 2007, the parties entered into a written settlement agreement ("Settlement Agreement") to resolve the August 2006 suit. In relevant part, the Settlement Agreement provided:

> Paradigm and the Individual Defendants [Solanji, Makhani, and Dhanani] shall not knowingly initiate contact with any individual or entity who was actually known by Paradigm and the Individual Defendants prior to the direct contact by Paradigm and Individual

2

Defendants to be a client of Alliantgroup. The parties agree that any violations of this provision will result in $50,000 in liquidated damages for each violation being owed by Paradigm and Individual Defendants, jointly, to Alliantgroup.

In September 2009, Alliantgroup filed a second lawsuit against Paradigm, resulting in the litigation underlying this appeal. Alliantgroup alleged that Paradigm had contacted two of Alliantgroup's clients—MGS Manufacturing Group, Inc. ("MGS") and Acutec Precision Machining, Inc. ("Acutec"). Alliantgroup asserted that Paradigm knew MGS and Acutec were its clients because Solanji and Makhani worked with MGS and Acutec when they were employed at Alliantgroup. Alliantgroup alleged causes of action for breach of the Settlement Agreement and for tortious interference with its on-going business relationships with MGS and Acutec.

On July 7, 2010, all of the Paradigm parties except for Paradigm Partners, LP moved for no-evidence summary judgment "on all claims asserted against them" by Alliantgroup and for "partial" summary judgment "on the issue of whether the liquidated damages provision of the [S]ettlement [A]greement constitutes an unenforceable penalty provision."[1]

---

[1] All of the Paradigm parties except for Paradigm Partners, L.P., moved for summary judgment on July 7, 2010. Paradigm Partners, L.P. originally filed an answer asserting that no such entity existed and also entering a general denial "in an abundance of caution." The trial court granted the July 7 no-evidence summary judgment. On March 2, 2011, Paradigm Partners, L.P. moved for no-evidence and traditional summary judgment against Alliantgroup. It classified itself as a

3

Alliantgroup responded to Paradigm's no-evidence motion for summary judgment. It argued that Acutec and MGS were both clients of Alliantgroup "at all times relevant to this case pursuant to a written contract." Alliantgroup argued that the contracts with Acutec and MGS both provided for audit defense and refund obligations that "extend[ed] the contractual obligations between the parties for up to over 20 years." Alliantgroup attached copies of the contracts it had entered into with both MGS and Acutec to perform R&D studies. Wes Bangerter, Alliantgroup's corporate representative, provided an affidavit with the copies of the contracts between Alliantgroup and Acutec and MGS attached. The affidavit stated that "[e]ach of these contracts provides that Alliantgroup shall provide audit defense representation to each respective client for up to over 20 years"; that Acutec had been a client of Alliantgroup from February 2, 2006 until the time of his affidavit (March 18, 2011); that "contracts between Acutec and Alliantgroup provide that Alliantgroup shall provide Acutec with tax consulting services during this entire period"; and that "[a]t no time did Acutec terminate its tax consultant

"partnership that is no longer authorized to do business in Texas" and stated that its "domestic limited partnership status was cancelled in August 2008." It further stated, "Paradigm Partners, L.P. maintains that it is not a proper party to this litigation and has filed a verified denial to that end." Nevertheless, Paradigm Partners, L.P. argued that it was entitled to summary judgment, asserting essentially the same grounds for summary judgment that the other Paradigm parties had asserted in their motion and reply. The trial court eventually granted this no-evidence motion for summary judgment as well, finally disposing of all Alliantgroup's claims against all parties. Paradigm does not contest the inclusion of Paradigm Partners, L.P. as a party to this appeal.

4

and client relationship with Alliangroup." He made similar statements regarding MGS's relationship with Alliantgroup.

Included in the summary judgment evidence was a contract dated February 2, 2006, and signed by Acutec's president on February 6, 2006, in which Alliantgroup agreed to perform an R&D study for Acutec for the tax years 2002 through 2005. In the agreement, Alliantgroup provided an estimated amount of available R&D tax credits for the 2002 through 2004 tax years, but provided that "the actual credits identified during the study may be more or less than the estimated amount. In addition, we can be engaged annually to capture the tax credit value of current and future R&D investments." Under "Scope of Services," the agreement outlined three separate phases of the R&D study to be performed for the 2002 through 2004 tax years: (1) assessment and feasibility, in which Alliantgroup would gather information about the company's business and research and development activities; (2) design and implementation, in which Alliantgroup would "design a detailed work plan and execute the associated implementation strategy," including "a full analysis of technical issues related to qualified R&D projects, detailed collection of eligible expenditures, and identification, documentation, and quantification of qualifying expenditures"; and (3) reporting, in which Alliantgroup would prepare and deliver the R&D study and provide the company's CPA with the necessary forms and schedules to amend the tax returns.

The agreement also provided that Alliantgroup's fees were "due upon delivery of study."

The February 2, 2006 agreement also provided for audit defense and a fee refund under certain circumstances:

> Our fee structure options include a refund provision for prior year credits. If it is ultimately determined, upon examinations and after you exhaust any and all legal alternatives that you deem appropriate, that the tax credits are unallowable, we will refund a pro-rata portion of the fee that resulted from the disallowed item or items. This provision is not applicable for a current year study. Furthermore, [A]lliantgroup will, at its own expense, represent you through the IRS Appellate Conference with respect to any challenge by the IRS of the benefits taken in relation to the R&D Study.

The agreement included an "Exhibit 1" that provided additional terms relevant to the agreement. Under "Services," it provided, "It is understood and agreed that [Alliantgroup] services frequently include advice and recommendations, but all decisions in connection with the implementation of such advice and recommendations shall be the responsibility of Client." It further provided that the client was required to file any amended tax returns with ten days of their delivery to the client and that Alliantgroup could deem the audit defense and refund provisions null and void in the event the client failed to adhere to this timeline.

The February 2, 2006 Acutec agreement further stated, under "Term,"

> Unless terminated sooner in accordance with its terms, *this engagement shall terminate on the completion of [A]lliantgroup's*

6

> *services hereunder.* This engagement may be terminated by either party at any time by giving written notice to the other party not less than ten (10) business days before the effective date of termination. In the event of termination by Client, Client shall be responsible to pay [A]lliantgroup for time and materials based on the firm's standard hourly rates for the services performed and expenses incurred through the effective date of termination. Furthermore, if Client terminates [A]lliantgroup's services, Client shall pay to [A]lliantgroup the outstanding fees and expenses incurred within seven (7) days of the effective date of termination.

(Emphasis added). The agreement provided that "'delivery of study' shall mean the date on which the client receives the written report for the research and development study. 'Delivery of study' does not include delivery of the amended tax returns."

MGS entered into an essentially identical agreement with Alliantgroup, dated February 21, 2005, and signed on March 4, 2005. MGS signed a second, slightly amended agreement with Alliantgroup on August 8, 2005, but the material provisions were still identical to the Acutec agreement. Alliantgroup performed R&D studies for MGS for the 2001 through 2003 tax years. These agreements were also included in Alliantgroup's summary judgment exhibits.

Exhibits attached to Alliantgroup's response to Paradigm's no-evidence motion for summary judgment in this 2009 litigation for breach of the 2007 Settlement Agreement also included the deposition testimony of Wes Bangarter. Bangarter stated that MGS and Acutec were current clients of Alliantgroup at the time they were allegedly contacted by Paradigm based on the 2005 and 2006

7

contracts. Specifically, Bangerter testified that Acutec and other companies remained "a continuing client as long as the statute runs on any open return and as long as there are carry-forwards of any credits." However, when asked if Alliantgroup was representing Acutec in any continuing returns, Bangerter answered, "Not to my knowledge. I don't represent—me, personally—clients."

Bangerter also testified by deposition that a client for which Alliantgroup had completed a R&D study "would be a client of Alliantgroup until they notified us differently." He stated that, to his knowledge, Acutec had not notified Alliantgroup that it wanted to disengage. When asked about the alleged contact between Paradigm and MGS, Bangerter answered:

> Mr. Dunst [at MGS] actually contacted our managing director of our TCS [Tax Controversy Services] group to let us know that someone from Paradigm—and I'm not sure who that person is—contacted him regarding R&D studies.

Bangerter further stated that Jeremy Fingeret was the managing director of the TCS group. Bangerter did not know what Dunst had told Fingeret about the contact from Paradigm because he "wasn't on that phone call." Bangerter affirmed that his "knowledge as Alliantgroup's rep is that there was a single phone call where Tom Dunst of MGS Manufacturing Group contacted Jeremy Fingeret and told him that somebody from Paradigm had contacted MGS regarding R&D studies. . . ."

Alliantgroup also relied on a series of e-mails it attached to its response to the motion for summary judgment, which included: a series of e-mails between Makhani and Acutec personnel related to the 2006 R&D study Makhani completed for Acutec while he was employed at Alliantgroup; e-mails between Mike Grenier, the regional director of Paradigm Partners, and Sandy Bates, Acutec's treasurer, in which Grenier discussed the services Paradigm could provide to Acutec and in which Bates expressed a lack of interest in further R&D studies; and a series of e-mails from 2005 and 2006 between Solanji, personnel at MGS, and other Alliantgroup personnel relating to the tax study Solanji helped prepare while he was working for Alliantgroup. Alliantgroup argued in its response that Bates had told Paradigm that Acutec was a client of Alliantgroup. However, neither the e-mails nor any other evidence in the summary judgment record supports this assertion.

Alliantgroup also attached to its response to Paradigm's no-evidence motion for summary judgment the deposition testimony of Lauren Meagher—the Paradigm employee who allegedly initiated the contact with Acutec. Meagher testified that she did not recognize the name Acutec and did not recall contacting Sandy Bates or anyone else at Acutec.

Paradigm replied to Alliantgroup's response to its no-evidence motion for summary judgment, arguing that Alliantgroup did not provide "[a]dmissible

9

evidence that anyone at Paradigm in fact contacted someone from MGS." Paradigm also argued that the evidence presented by Alliantgroup did not provide evidence of "existing contracts with Acutec and MGS," as both of the contracts presented with Alliantgroup's response to the motion for no-evidence summary judgment had "long expired by their own terms." Thus, Paradigm argued that it was entitled to no-evidence summary judgment on Alliantgroup's breach of contract claims. Regarding Alliantgroup's tortious interference claim, Paradigm argued that Alliantgroup did not present any evidence of existing contracts with MGS and Acutec, of Paradigm's willful and intentional interference with any contracts, or of any injury to Alliantgroup resulting from the alleged interference.

The trial court granted no-evidence summary judgment in favor of Paradigm, ordering that Alliantgroup take nothing by its breach of contract and tortious interference claims. This appeal followed.

### Standard of Review

We review de novo the trial court's grant of summary judgment. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). We must make inferences, resolve doubts, and view the evidence in the light most favorable to the non-movant. *Rhône–Poulenc, Inc. v. Steel*, 997 S.W.2d 217, 223 (Tex. 1999). A no-evidence summary judgment motion asserts that no evidence exists as to at least one essential element of the non-movant's claims on which the non-

movant would have the burden of proof at trial. TEX. R. CIV. P. 166a(i); *Bendigo v. City of Houston*, 178 S.W.3d 112, 114 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (citing *Jackson v. Fiesta Mart, Inc.*, 979 S.W.2d 68, 70–71 (Tex. App.—Austin 1998, no pet.)). The trial court must grant the motion unless the non-movant produces summary judgment evidence that raises a genuine issue of material fact. TEX. R. CIV. P. 166a(i); *see Sw. Elec. Power Co. v. Grant*, 73 S.W.3d 211, 215 (Tex. 2002).

### Breach of Contract

To prevail on its breach of contract claim against Paradigm, Alliantgroup must prove (1) the existence of a valid contract; (2) the plaintiff's performance or tender of performance; (3) the defendant's breach of contract; (4) the plaintiff's damages as a result of the breach. *Prime Prods., Inc. v. S.S.I. Plastics, Inc.*, 97 S.W.3d 631, 636 (Tex. App.—Houston [1st Dist.] 2002, pet. denied). The interpretation or construction of an unambiguous contract is a matter of law to be determined by the court. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003). "An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports." *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008). Whether a contract is ambiguous is a question of law. *Id.* at 451. We may not use extrinsic evidence to

11

contradict or vary the meaning of the explicit language of a written contract. *Nat'l Union Fire Ins. Co. v. CBI Indus., Inc.*, 907 S.W.2d 517, 521 (Tex. 1995).

Paradigm primarily argued in its no-evidence motion that Alliantgroup had presented no evidence that Paradigm had breached the Settlement Agreement because it had not shown that Acutec and MGS were current clients at the time of the alleged contacts. Paradigm argues that the only evidence that Alliantgroup presented demonstrates that Acutec and MGS were former clients.

Specifically, Paradigm argued that Alliantgroup failed to provide evidence necessary to support Alliantgroup's breach of contract claim, including evidence of "[e]xisting contracts with Acutec and MGS. The contracts that Alliantgroup provided for both Acutec and MGS have long expired by their own terms." Paradigm argued in the trial court,

> [T]he [S]ettlement [A]greement requires that Paradigm have knowledge that Acutec was a client of Alliantgroup and requires that Acutec in fact be a client of Alliantgroup. Alliantgroup has not presented any evidence that Paradigm knew that Acutec was a then existing client of Alliantgroup and the documents included with its response in fact demonstrate that Acutec was not an Alliantgroup client in July 2009 when there was limited contact with Acutec.

Regarding the meaning of the Settlement Agreement, Paradigm argued in the trial court that the "language of the [S]ettlement [A]greement must be applied as written" and that the Settlement Agreement "clearly calls for contact with a company known 'to be a client of Alliantgroup.' It does not reference companies

12

who were once clients of Alliantgroup." Paradigm challenged Alliantgroup's interpretation of the Settlement Agreement that would "expand the meaning of the [S]ettlement [A]greement to include any company that it may have had a contractual relationship with at some point in the past" because "[t]hat is not how the [S]ettlement [A]greement was written." Paradigm made similar arguments concerning Alliantgroup's breach of contract claim as it related to MGS.

In order to determine whether Alliantgroup provided more than a scintilla of evidence that Paradigm breached the Settlement Agreement, we must analyze the Settlement Agreement and reach a conclusion regarding what action would constitute a breach under its terms. The Settlement Agreement unambiguously provided that Paradigm "shall not knowingly initiate contact with any individual or entity who was actually known by Paradigm and the Individual Defendants prior to the direct contact by Paradigm and Individual Defendants *to be a client* of Alliantgroup." (Emphasis added). Thus, the Settlement Agreement uses the present tense in describing clients, indicating that Paradigm agreed not to contact entities that were clients of Alliantgroup at the time of the contact. The plain language of the Settlement Agreement does not contemplate a restriction against contacting any corporation or entity that had been *a former client* or *potential client* of Alliantgroup. *See Dynegy Midstream Servs., Ltd. P'ship v. Apache Corp.*, 294 S.W.3d 164, 168 (Tex. 2009) (holding that courts construing contracts must

13

give terms their plain and ordinary meaning unless contract indicates that parties intended different meaning, and "[a] contract is not ambiguous simply because the parties disagree over its meaning"); *SAS Inst., Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005) (per curiam) (holding that intent manifested in contract's language "is not changed simply because the circumstances do not precisely match the scenarios anticipated" when contract was formed and that "a court interprets a contract by ascertaining the true objective intentions of the parties, based on the contract language").

Considering the plain language of the Settlement Agreement, we conclude that Alliantgroup had to present some evidence that Acutec and MGS were its clients at the time of Paradigm's alleged contacts in 2009. But Alliantgroup produced no evidence that anyone allegedly contacted by Paradigm was a client of Alliantgroup at the time of the alleged contacts. Evidence that Acutec and MGS were former clients, without more, is insufficient to establish that Paradigm breached the Settlement Agreement when it allegedly contacted MGS and Acutec in 2009. We conclude that Alliantgroup failed to present any evidence that it had a current client relationship with either Acutec or MGS in 2009, which was an essential element of its claim.[2] *See Prime Prods., Inc.*, 97 S.W.3d at 636 (setting

---

[2]     Moreover, in construing the meaning of the Settlement Agreement, as we must do to resolve the issues presented by the parties in their motions and briefing, we must be cognizant of the fact that this clause in the Settlement Agreement is

14

out elements of breach of contract claim); *see also Haden*, 266 S.W.3d at 450 (holding that unambiguous contract will be enforced as written).

Alliantgroup argues that Acutec and MGS were its clients at the time of the alleged contacts in 2009 based solely on the 2006 contracts for R&D studies. Bangerter's affidavit and deposition stated that Acutec and MGS were its clients in 2009 because of the terms of these 2006 agreements, which obligated Alliantgroup to provide audit defense, and because neither company had stated that it wished to end its engagement with Alliantgroup.

---

essentially a covenant not to compete between Alliantgroup and its former employees, and thus is subject to the requirements of the Covenants Not to Compete Act. *See Marsh USA Inc. v. Cook*, 354 S.W.3d 764, 768 (Tex. 2011) ("Covenants that place limits on former employees' professional mobility or restrict their solicitation of the former employers' customers and employees are restraints on trade and are governed by [the Covenants Not to Compete Act found in Business and Commerce Code Chapter 15]."). Although the parties do not make any arguments or provide any briefing on this law, in construing a contract, we must bear in mind the particular business activity to be served, and when possible and proper to do so, avoid a construction that is unreasonable, inequitable, and oppressive. *See Frost Nat'l Bank v. L & F Distribs., Ltd.*, 165 S.W.3d 310, 312 (Tex. 2005) (per curaim); *U.S. Denro Steels, Inc. v. Lieck*, 342 S.W.3d 677, 682 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). Texas law requires that covenants not to compete must contain "limitations as to time, geographical area, and scope of activity to be restrained that are reasonable and do not impose a greater restraint than is necessary to protect the goodwill or other business interest of the promisee." TEX. BUS. & COM. CODE ANN. § 15.50(a) (Vernon 2011); *Cook*, 354 S.W.3d at 777. Accordingly, in construing and enforcing the Settlement Agreement, we must not reach an interpretation of that agreement that imposes a greater restraint than necessary to protect Alliantgroup's business interests. *See* TEX. BUS. & COM. CODE ANN. § 15.50(a); *Cook*, 354 S.W.3d at 777.

15

However, the terms of the agreements themselves did not, as Alliantgroup argues, contemplate the existence of an ongoing client relationship. Rather, they provided that Alliantgroup would provide a limited service—the three-part R&D tax study—in exchange for payment of fees upon delivery of the studies. The agreement explicitly stated, "Unless terminated sooner in accordance with its terms, *this engagement shall terminate on the completion of [A]lliantgroup's services hereunder.*" (Emphasis added). Although the agreement did not define the completion of its services as the delivery of the R&D study, it did state that delivery of the study triggered the client's obligation to pay Alliantgroup's fees. Likewise, the agreement did not define "the effective date of termination." However, the other provisions under the "Term" section of the agreement indicate that the parties intended for the termination of the agreement to occur before the payment of Alliantgroup's fees:

> This engagement may be terminated by either party at any time by giving written notice to the other party not less than ten (10) business days before the effective date of termination. In the event of termination by Client, Client shall be responsible to pay [A]lliantgroup for time and materials based on the firm's standard hourly rates for the services performed and expenses incurred through the effective date of termination. Furthermore, if Client terminates [A]lliantgroup's services, Client shall pay to [A]lliantgroup the outstanding fees and expenses incurred within seven (7) days of the effective date of termination.

Furthermore, the terms of the agreement indicated that the audit-defense and fee-refund provisions were not the result of an ongoing business relationship;

16

rather, they were provisions that were triggered by "any challenge by the IRS of the benefits taken in relation to the R&D Study." Alliantgroup presented no evidence that such a challenge had occurred, and Bangerter specifically testified that he was not aware of any continuing work that Alliantgroup had performed for either Acutec or MGS pursuant to the R&D studies it completed and delivered in 2006. The agreements also stated that Alliantgroup could "be engaged annually to capture the tax credit value of current and future R&D investments," but there was no evidence that either Acutec or MGS engaged Alliantgroup to complete any additional work following the completion of the 2006 R&D studies. In fact, Alliantgroup failed to present any testimony or other evidence that any of its employees had had any contact with Acutec or MGS since the completion of the R&D tax studies.

We conclude that, by their own terms, the client agreements between Alliantgroup and Acutec and MGS do not provide for an ongoing relationship. Thus, the agreements do not support Alliantgroup's allegation that Acutec and MGS were its clients in 2009, approximately three years after Alliantgroup's delivery of the contracted-for R&D studies. The only other evidence that Alliantgroup presented that Acutec and MGS were its clients in 2009 was the affidavit and deposition testimony of Wes Bangerter. However, Bangerter's testimony stated that the client relationship was created by the 2006 agreements.

17

To the extent that Bangerter made conclusory statements in his affidavit that Actuec and MGS were clients of Alliantgroup in 2009, when the alleged contact by Paradigm took place, those statements are not competent summary judgment evidence. *See Wadewitz v. Montgomery*, 951 S.W.2d 464, 466 (Tex. 1997) (holding that conclusory statement in affidavit, unsupported by facts, is insufficient to support or defeat summary judgment). And Bangerter averred that he had not done any work for Acutec or MGS following the delivery of the R&D studies in 2006, nor was he aware of any work done by anyone at Alliantgroup or any further contacts with those firms.

We conclude that, as a matter of law, the contracts relied upon by Alliantgroup did not establish that Acutec and MGS were clients of Alliantgroup at the time of the alleged contacts in 2009. We further conclude that Bangerter's testimony on the legal question of the term or effect of the client agreements is not evidence that can alter or vary the intent of the parties as expressed in those agreements. *See Haden*, 266 S.W.3d at 450 ("[P]arol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports."). Alliantgroup does not point to any other evidence establishing that Acutec and MGS were its clients in 2009 at the time of Paradigm's alleged contacts.

Thus, we conclude that the trial court did not err in granting Paradigm's no-evidence summary judgment motion on Alliantgroup's breach of contract claims. *See* TEX. R. CIV. P. 166a(i); *Grant*, 73 S.W.3d at 215.

**Tortious Interference**

The elements of a tortious interference claim are (1) an existing contract subject to interference; (2) a willful and intentional act of interference with the contract; (3) that proximately caused the plaintiff's injury; and (4) caused actual damages or loss. *Funes v. Villatoro*, 352 S.W.3d 200, 213 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). Texas also recognizes a cause of action for tortious interference with a prospective contract. *See Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 726 (Tex. 2001) ("We therefore hold that to recover for tortious interference with a prospective business relation a plaintiff must prove that the defendant's conduct was independently tortious or wrongful."). "To prevail on a tortious interference claim, a plaintiff must present evidence that the defendant interfered with a specific contract." *Funes*, 352 S.W.3d at 213 (citing *Finlan v. Dallas Indep. Sch. Dist.*, 90 S.W.3d 395, 412 (Tex. App.—Eastland 2002, pet. denied)).

We have already concluded that Alliantgroup did not provide any evidence of an ongoing contract with either Acutec or MGS. Indeed, the summary judgment evidence indicated that the 2006 contracts were fully performed—i.e., Alliantgroup

19

delivered the R&D studies and the clients paid the fees—years prior to the alleged contact by Paradigm. Alliantgroup does not point to any specific contract or potential contract with either Acutec or MGS that Paradigm's alleged contacts negatively affected. *See Funes*, 352 S.W.3d at 213.

Thus, we conclude that the trial court did not err in granting Paradigm's no-evidence summary judgment motion on Alliantgroup's tortious interference claims.[3] *See* TEX. R. CIV. P. 166a(i); *Grant*, 73 S.W.3d at 215.

---

[3] Because we hold that the trial court did not err in granting no-evidence summary judgment on the ground that Alliantgroup failed to present evidence that Acutec and MGS were "clients" under the Settlement Agreement at the time Paradigm allegedly contacted them, we do not address the remaining arguments on these issues. Furthermore, we need not address Alliantgroup's arguments regarding the liquidated damages provision in the Settlement Agreement. Alliantgroup also argues that Solanji and Dhanani violated various Disciplinary Rules of Professional Conduct. However, Texas courts have consistently held that the Texas Disciplinary Rules of Professional Conduct do not define standards for civil liability and do not give rise to private claims. *See, e.g.*, *Blankinship v. Brown*, 399 S.W.3d 303, 311 (Tex. App.—Dallas 2013, pet. denied) (citing Texas Disciplinary Rules of Professional Conduct preamble, which states that Disciplinary Rules do not define standards of civil liability and that violation of rule does not give rise to private cause of action); *Garcia v. Garza*, 311 S.W.3d 28, 43–44 (Tex. App.—San Antonio 2010, pet. denied); *Dardas v. Fleming, Hovenkamp & Grayson, P.C.*, 194 S.W.3d 603, 613 (Tex. App.—Houston [14th Dist.] 2006, pet. denied); *see also Wright v. Sydow*, 173 S.W.3d 534, 549 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (holding that alleged violation of Disciplinary Rules does not necessarily establish cause of action and does not void otherwise valid contract outside of attorney-client relationship). Thus, we do not address these arguments.

## Conclusion

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes, Higley, and Massengale.

Justice Massengale, dissenting.